AUGUSTA G. GENET, Appellant, v. THE PRESIDENT, ETC.,
. OF THE DELAWARE AND HUDSON CANAL COMPANY,
Respondent.

The parties executed an instrument in writing termed therein a "memo-
randum of agreement." It certified that plaintiff had "leased" to defend-
ant "all the coal contained in or under" certain lands in the state of
Pennsylvania therein described. It was stipulated "that if the coal in
any of the veins shall not prove to be of a merchantable quality or if it
becomes impracticable to mine the same," because of extraordinary
expenses or if the veins should prove of such quality or thickness that
the coal cannot be mined and prepared for market without greater
expense than the mining on adjoining properties required, then that the
liability of defendant to take and pay for the coal shall cease and that it
is "to pay for only the quantity of coal that can be safely and economic-
ally taken out," also that if "a fault" occurs, requiring an expenditure
of more than $500 to remove it, defendant is not required so to do.
Defendant stipulated to pay a specified royalty "for the coal mined and
taken out," upon every ton "of clear merchantable coal, exclusive of
culm or mine waste that will pass through a mesh of one-half inch
square." Then followed a description of what was meant by the term
"merchantable coal," and it was provided that what should be deemed
such was to be determined by defendant's superintendent or inspector.
Held, that the instrument was not, and did not operate as, a conveyance
of the coal veins or strata; that its subject-matter was mineral product
not land; that the contract was executory in its nature, what and
how much coal was to pass under it being made dependent on the revela-
tions of the actual mining ; and that defendant was not required to take
any coal which did not so pass or entitled to take coal it did not pay for.
Plaintiff's complaint alleged in substance that there were three veins of
coal underlying the surface; that defendant instead of mining the upper
vein first, took but a moderate quantity therefrom, but mined out the
middle vein under a large portion of the land, that it did this so negligently
and left such insufficient support, that the rock, earth and coal above
fell down into and ruined the mine and the whole body of coal was lost
to defendant, and that since the occurrence defendant had not taken out
any coal. Held, that although there was no express stipulation in the
. contract against such a negligent destruction of the mine, it was to be
implied; and that plaintiff had a right of action upon this implied
promise.
Genet v. D. & H. Canal Co. (122 N. Y. 527), distinguished and limited.
Sanderson v. Scranton (105 Penn. St. 472), distinguished.

(Argued December 16, 1892; decided January 17, 1893.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, entered upon an order made February 14, 1890, which reversed an interlocutory judgment entered upon an order of Special Term overruling a demurrer to the complaint and ordered that said demurrer be sustained and final judgment directed in favor of defendant dismissing the complaint.

The complaint set forth a written instrument, the material portions of which are as follows:

" Memorandum of agreement made and concluded this twenty-eighth day of March, A. D. one thousand eight hundred and sixty-four (1864), between George C. Genet and Augusta G. Genet, his wife, of the city, county and state of New York, of the first part, and the president, managers and company of the Delaware and Hudson Canal Company of the second part, witnesseth : That the said parties of the first part, for themselves, their heirs, executors, administrators and assigns, as well for, and in consideration of the covenants and agreements hereinafter mentioned, to be kept and performed by and on the part of the said party of the second part, as for and in consideration of the sum of one dollar to each of them in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged, hath leased and doth hereby lease unto the said president, managers and company of the Delaware and Hudson Canal Co., their successors and assigns, all the coal contained in, on or under that certain piece or parcel of land situate lying and being in the borough and township of Providence, county of Luzerne, and state of Pennsylvania, described as follows, to wit:

" Said coal supposed to be contained in the veins known and distinguished as the ' Diamond,' ' Fourteen Foot,' and ' Clark Veins,' but in any event to include all the coal that can be economically mined or taken out from the above-described premises, together with the right to enter upon and into said lands, and to dig and mine and remove said coal through or out of any shafts, slopes or tunnels they may dig, erect or construct upon the premises. And the said party of the second

part, their successors and assigns, doth hereby promise and agree to mine from said land in the year one thousand eight hundred and sixty-four, not less than ten thousand tons of coal; in the year one thousand eight hundred and sixty-five, not less than ten thousand tons, and twenty thousand in each and every year thereafter. It being understood that the said party of the second part is to pay for ten thousand tons in each and every year, whether the same shall be actually taken out in such year or not, and that in case the maximum quantity of twenty thousand is not taken out in one thousand eight hundred and sixty-six, or any subsequent year, interest at the rate of seven per centum per annum, shall be paid by the said party of the second part to the said party of the first part, their heirs or assigns, upon such sums as the deficiency shall amount to, said interest to be continued until the full quantity agreed to be taken out as aforesaid shall be reached; provided, that the said party of the second part shall not have been relieved from liability to mine said coal in whole or in part, as is hereinafter mentioned; and, provided further, that the said party of the second part shall have the privilege of taking out without charge at any time thereafter a quantity of coal equal in amount to the deficiency they may have paid for in any previous year or years. And it is further agreed, that if the coal in any of the veins shall not prove to be of a merchantable quality, or if it become impractical to mine the same in consequence of extraordinary expenses in mining and cleaning said coal or if the veins should prove to be of such quality and thickness that the coal cannot be mined and prepared for market without greater expense than is bestowed upon coal taken from the same veins in the mines of the party of the second part for the time then being, then the liability of the said party of the second part to mine, take and pay for said coal shall cease. And it is further understood and agreed that in case the quantity of coal mined and taken out in any one year shall fall below the quantity agreed to be taken out in such year, in consequence of the unmerchantable quality of the coal in any of the veins, or in consequence of increased

expense and difficulty in mining and cleaning the said coal, as hereinbefore recited, or in case the said land shall become so far exhausted as to render it impracticable or unprofitable to mine the stipulated quantity in any one year, then in either case the said party of the second part are only to pay for the quantity of the coal that can be safely and economically taken out.

"And the said party of the second part agree to pay for the coal mined and taken out in pursuance of this agreement at the rate of twelve and a half cents (12½) for every ton· of (2,240) twenty-two hundred and forty pounds of clear merchantable coal, exclusive of culm or mine waste that will pass through a mesh of one-half inch square. * * *

"And it is further understood and agreed that if the said party of the second part elect to do so, they may increase the quantity beyond that stipulated to be mined in any one year, and at their option may diminish the quantity for any succeeding year or years by an amount corresponding with such increase. Provided that the quantity mined shall not be less in the aggregate than is hereinbefore stipulated.

"And it is further agreed that in the event of a fault occurring in the said mines, or in any of the veins of coal to be worked under this agreement, the said party of the second part may give notice of such fault to the said parties of the first part, their heirs or assigns, when the said parties of the first part, their heirs or assigns, may elect either to abandon that portion of the work or vein in which the said fault occurs, or to direct the said party of the second part to drive through the said fault, paying to the said party of the second part all the expenses necessarily incurred in so doing over and above the sum of five hundred dollars (500), it being understood that the said party of the second part are to pay the whole cost of driving through or removing any such fault, when such cost does not exceed five hundred dollars (500). Provided, however, that the said party of the second part shall not be required by said parties of the first part, their heirs or assigns, to drive through or remove any such fault against the judg-

ment or advice of the mining engineer of the said party of the second part, except on the following conditions.

"'The said parties of the first part, their heirs or assigns, may make request in writing to have said party of the second part drive through or remove such fault in opposition to the advice of said mining engineer of the said party of the second part, when the said party of the second part shall proceed in the work of endeavoring to remove such fault, and shall continue until the said parties of the first part shall decide to abandon said work, when if the "fault" be not overcome, the said parties of the first part, their heirs or assigns, shall pay the said party of the second part the whole cost of prosecuting said work.

" It is further mutually understood and agreed that the term ' merchantable coal ' shall be understood and defined as follows, to wit : That all coal mined under this agreement shall be with the same expense of mining, cleaning, of as good quality as the average of coal taken from other mines of and sent to market by the said party of the second part, and that it shall be subject to the inspection of the superintendent of the said party of the second part, or such other person as they may employ for that purpose, whose decision as to the quality of said coal shall be final and conclusive."

The material averments of the complaint are set forth in the opinion.

*George C. Genet* for appellant. The agreement is a license to mine coal from land belonging to plaintiff in Pennsylvania, upon payment of a royalty per ton. It embraces all the coal upon or in the land that may prove to be of a certain quality. It is known in law as a license to mine. The court had jurisdiction of the cause of action alleged. ( *Willetts* v. *Waite,* 25 N. Y. 588; Pollock on Torts, 437.) Coal may be sold or leased to be mined and removed and paid for by the ton after it is taken out and cleaned. In such cases the subject of the sale ceases to be a part of the real estate and becomes personal property, and the rights of the parties depend upon the con-

tract alone. (*Douglas* v. *Shumway*, 13 Gray, 502; *Claflin* v. *Carpenter*, 4 Metc. 580; *Smith* v. *Surinam*, 9 B. & C. 561; *Marshall* v. *Green*, 1 L. R. [C. P. Div.] 35; *Mumford* v. *Whitney*, 15 Wend. 380; 11 Allen, 141; 4 Metc. 580; 8 id. 34; 4 id. 372; 7 Green, 447; 13 B. Mon. 340; 54 Me. 105; 15 Gray, 441; 3 Day, 484; *Smith* v. *Benson*, 1 Hill, 176; Am. Lead. Cas. [4th Am. ed.] 739, 752; *Buck* v. *Pickwell*, 27 Vt. 157; *U. P. Co.* v. *B. P. Co.*, 72 Penn. St. 173; *Saunderson* v. *Scranton*, 105 id. 469; *In re Lazarus*, 144 id. 1; *Kingsley* v. *C. & S. Co.*, Id. 628; *Stephens* v. *Santee*, 49 N. Y. 37; *Joice* v. *Andrews*, 4 Seld. 291; *McDonald* v. *Hewitt*, 15 Johns. 349; *Evans* v. *Harris*, 19 Barb. 416; *Andrews* v. *Durant*, 11 N. Y. 35; *Jackson* v. *Hunt*, 11 Wend. 137; *Merritt* v. *Johnson*, 7 Johns. 473; *Gregory* v. *Stryker*, 2 Den. 628; *Hurd* v. *Cook*, 75 N. Y. 459; *Muchlow* v. *Bayland*, Taunt. 318; Adams on Ejectment, 21; *Genet* v. *D. & H. C. Co.*, 122 N. Y. 505.) The writing is a contract or else it is a lease at will as to the coal beyond the quantity positively stipulated to be mined. When in a contract no time is fixed for its performance it cannot be postponed to eternity, and thereby defeated, it must be fulfilled with reasonable industry. (*Watson* v. *O'Hara*, 6 Watts, 362; *Lyon* v. *Miller*, 24 Penn. 342; *Kock's Appeal*, 93 Penn. St. 434; *Sharp* v. *Wright*, 28 Beav. 150; *Doe* v. *Richards*, 4 Ind. 374; 1 Washb. on Real Prop. 371, §§ 6, 7, 9; 2 Flint on Real Prop. 216; *Cheever* v. *Parsons*, 16 Pick. 272; *Post* v. *Post*, 14 Barb. 253; *Mumford* v. *Whitney*, 15 Wend. 380; *Wolf* v. *Frost*, 2 Sand. Ch. 72; *Doolittle* v. *Eddy*, 7 Barb. 74; *O. O. Co.* v. *T. R. R. Co.*, 4 Civ. Cas. Ohio, 210–214.) The agreement was a severable and conditional contract and was, therefore, an executory contract, and no present title passed by it to the defendants. (Story on Sales, §§ 232, 242, 246; Story on Cont. § 16.) The rights of the parties in the contract are governed and to be interpreted by the laws of this state. (*Langdon* v. *Mayor, etc.*, 93 N. Y. 145; *Auburn Road* v. *Douglas*, 9 id. 444; *Trunby* v. *Vignier*, 1 Bing. [N. C.] 151; *B. C. Co.* v. *Drummond*, 10 B. & C. 903; *De la Vega* v. *Vianna*, 1 B. & Ad. 284; *Rob-*

*inson* v. *Armstrong*, 34 Me. 145 ; *Morrice* v. *Hurry*, 7 Taunt. 306 ; *Stamway* v. *Bishop*, 3 B. & C. 9.) The complaint shows a good cause of action against defendants for the injury to such of the unmined coal as they had a right to mine under the agreement, but have rendered incapable of being mined by careless and negligent mining of another portion. That is, having a right to mine certain of the coal, that might prove to be of a certain quality, and would pass over a half inch square mesh after being separated and being in possession of the whole for the purpose of making this selection and while so mining a part, they carelessly and negligently destroyed another portion that includes coal that would have answered their purpose, they became liable to pay for it at the stipulated price per ton in an action of assumpsit based on the contract — and this is exactly the action stated in this complaint. (*Marvin* v. *B. I. Co.*, 55 N. Y. 563 ; *Selden* v. *D. & H. C. Co.*, 29 id. 640.)

*Frank E. Smith* for respondent. The cause of action stated in the complaint, if any there be, is *ex delicto* to recover damages for a wrongful injury to real property, and is in the nature of waste. (Pollock on Torts. 285 ; 6 Wait's Act. & Def. 239.) The court has no jurisdiction over the subject of the action. (*Doulson* v. *Matthews*, 4 T. R. 503 ; *Mayor, etc.,* v. *Cox*, L. R. [2 H. of L.] 239, 261 ; *Whitaker* v. *Forbes*, L. R. [10 C. P.] 583 ; *Mason* v. *Warner*, 31 Mo. 508 ; *D. M. C. Co.* v. *Mitchell*, L. R. [11 App. Cas.] 127 ; Gould on Pleadings [5th ed.] 105, 107 ; *Watts* v. *Kinney*, 6 Hill, 82 ; *A. U. T. Co.* v. *Middletown*, 80 N. Y. 408 ; *Cragin* v. *Lovell*, 88 id. 258 ; *Dodge* v. *Colby*, 108 id. 445 ; *Mott* v. *Coddington*, 1 Abb. Pr. [N. S.] 290 ; *Foot* v. *Edwards*, 3 Blatch. 310 ; *Thayer* v. *Brooks*, 17 Ohio, 489 ; *Worster* v. *W. L. Co.*, 5 Foster [N. H.], 525 ; *The M. M. L. R.*, 1 P. D. 43, 107 ; *Prevost* v. *Gorrell*, 2 Wkly. Notes, 440 ; 3 id. 366.) The complaint states no cause of action upon contract. (*Bogardus* v. *N. Y. L. Ins. Co.*, 101 N. Y. 328 ; *Dillon* v. *Barnard*, 21 Wall. 430 ; *Genet* v. *D. & H. C. Co.*, 122 N. Y. 505 ; *Vail* v. *L. I.*

*R. R. Co.*, 106 id. 283 ; *Manning* v. *Frazier*, 96 Ill. 279 ; *H. C. Co.* v. *P. C. Co.*, 8 Wall. 276 ; *Scranton* v. *Phillips*, 94 Penn. 15 ; *Williams* v. *Bagnall*, 12 Jur. [N. S.] 987 ; *Smith* v. *Darby*, L. R. [7 Q. B.] 716 ; *Wheatley* v. *W. B. C. Co.*, L. R. [9 Eq.] 538, 553 ; *Jegon* v. *Vivian*, L. R. [6 Ch. App.] 742 ; *Mellers* v. *Duke of Devonshire*, 16 Beav. 252 ; *Simpson* v. *Ingleby*, 20 Wkly. Rep. 587 ; *McIntyre* v. *M. C. Co.*, 105 N. Y. 264, 272, 273 ; *Lent* v. *N. Y. & M. R. R. Co.*, 130 id. 504.) The right to connect the workings in the Genet property with the workings in defendant's other collieries is implied from the nature of the estate in the coal and other rights granted to defendant. (MacSwinney on Mines, 27 ; Bainbridge on Mines [4th ed.], 28 ; *Caldwell* v. *Fulton*, 31 Penn. St. 475 ; *Caldwell* v. *Copeland*, 37 id. 427 ; *Armstrong* v. *Caldwell*, 53 id. 284, 287 ; *Clement* v. *Young*, 40 id. 341 ; *D., L. & W. R. R. Co.* v. *Sanderson*, 109 id. 583 ; *Woodward* v. *D., L. & W. R. R. Co.*, 121 id. 344 ; *Eley's Estate*, 2 Kulp, 277 ; *Fairchild* v. *Fairchild*, 7 Cent. Rep. 873 ; *C. E. Co.* v. *Lucas*, 112 Mass. 424 ; *Massot* v. *Moses*, 3 S. C. [N. S.] 168 ; *Manning* v. *Frazier*, 96 Ill. 297 ; *Brown* v. *Corey*, 43 Penn. St. 495 ; *Vail* v. *L. I. R. R. Co.*, 106 N. Y. 283 ; *Duke of Hamilton* v. *Graham*, L. R. [2 Scotch App.] 166 ; *Ramsay* v. *Blair*, L. R. [1 App. Cas.] 701 ; *Proud* v. *Bates*, 34 L. J. [N. S.] 406 ; *Marvin* v. *B. I. M. Co.*, 55 N. Y. 538 ; *Yandes* v. *Wright*, 66 Ind. 319.)

FINCH, J. The questions in this case, which are both difficult and important, arise upon a demurrer which denies that the complaint of the plaintiff contains any cause of action. That complaint sets out literally the contract between the parties which is in writing and in the form of a lease. They differ widely as to its construction, the lessors describing it as an agreement merely, which, although relating to an interest in land, does not convey the land in fee, while the lessee construes it as a deed of the coal veins or strata underlying the surface, and as a severed parcel of the land itself. It is important to settle that question at the outset, for we shall find

in the end that the application of very material rules of construction depends upon the legal character and effect of the paper which the parties executed.

That paper denominates itself a "memorandum of agreement," and not an indenture or deed, and yet takes the form of a lease. It certifies that the parties of the first part have "leased" to the party of the second part "all the coal contained in, on or under" the parcel of land specifically described. This general provision, however, is narrowed, restricted and limited by other provisions of the lease which modify its effect and operation. It is stipulated "that if the coal in any of the veins shall not prove to be of a merchantable quality, or if it become impractical to mine the same in consequence of extraordinary expenses in mining or cleaning said coal, or if the veins should prove to be of such quality or thickness that the coal cannot be mined and prepared for market without greater expense than is bestowed upon coal taken from the same veins in the mines of the party of the second part for the time then being, then the liability of the party of the second part to mine, take and pay for said coal shall cease. And it is further understood and agreed that in case the quantity of coal mined and taken out in any one year shall fall below the quantity agreed to be taken out in such year in consequence of the unmerchantable quality of the coal in any of the veins, or in consequence of increased expense and difficulty in mining and cleaning the said coal as hereinbefore recited, or in case the said land shall become so far exhausted as to render it impracticable or unprofitable to mine the stipulated quantity in any one year, then in either case the party of the second part are to pay for only the quantity of the coal that can be safely and economically taken out." Then follows a further limitation that the lessee shall only pay royalty "for the coal mined and taken out" upon every ton "of clear merchantable coal, exclusive of culm or mine waste that will pass through a mesh of one-half inch square." There is also a precise description of what is meant by the phrase "merchantable coal," and what should be deemed such is, after inspec-

tion, to be left to the final decision of the defendant's superintendent, or other selected inspector. Reading the contract as a whole, I think we are bound to say that there was no sale of the bulk or body of the coal in place and as a severed portion of the land, and that there was no such intention, purpose or agreement on either side. It is quite true that, in an action between the same parties, the Second Division of this court has expressed the opinion, very briefly, and I think incidentally, that this contract operated as a deed to convey the fee of the coal to the defendant corporation. (122 N. Y. 505.) If the decision to that effect had been material to a disposition of the case, necessary to its determination, and within the issues presented, I should hold it conclusive as settling the law between these parties, however I might regard it in the future as a precedent. But the question was not in the case or at all necessary to its decision. That action was brought by the plaintiff to recover damages against the defendant for not mining the coal with reasonable diligence, and for a misuse of the mine in connection with other properties. The first cause of action failed because there was no proof except that offered by parol of the assumption by defendant of any such obligation; and the second because whatever was done was held to be within the explicit terms of the contract itself. Thus the right to use the shafts and machinery on plaintiff's land in aid of mining operations on adjoining lands was held to be expressly given as a present right by the terms of the instrument; the right to pile culm and waste upon the surface was found in its express permission; and the right of drainage through the gangways opened to other shafts to the lower point of the Marvin shaft, to be thence pumped out to the river, was deduced from the terms and conditions of the contract. It was not vital or essential to any of these conclusions that the contract did or did not convey the coal in fee. That opinion, therefore, does not bind us: but respect for it requires a careful examination of the question.

The authorities cited were all cases determined in the Supreme Court of Pennsylvania. The decisions of that court

are entitled to great weight in the present inquiry not only because of its character and ability, but also because coal mining in that state is an enormous industry over which its courts naturally watch with anxious care, and to the law controlling which they are required to give constant study. They have held, until the rule must be deemed firmly established in those tribunals, that a transfer of all the coal in, on, or under a given described surface, even though taking the form of a lease and terminable in a fixed number of years, is a sale of the coal and a grant of it in fee as a severed parcel of the land. The doctrine is perhaps most fully developed in *Sanderson* v. *Scranton* (105 Pa. 472). It was there said that a mineral lease was often in fact a sale ; that it differs from an ordinary lease, in that the latter gives only the temporary use and for a fixed period which is the term, and so implies and leaves in the lessor a reversion, while the former conveys the entire interest in the coal and leaves no reversion ; that in such a case there is a severance of the surface from the underlying strata which creates a divided ownership in the land, the coal belonging in fee to one and the surface to another. The court said frankly that the case was not free from doubt because the agreement was in form a lease for a fixed period with a rent reserved and power of distress. Whatever we may think of the general doctrine one thing about it is quite obvious. It applies to a case and only to a case in which by the terms of the agreement and in contemplation of the parties the whole body of the coal, considered as of cubical dimensions and capable of$^{\circ}$ descriptive separation from the earth above and around it (*Massot* v. *Moses*, 8 Min. Rep. 607), and as it lies in its place, is absolutely and presently conveyed. The thing sold must be such that it can be identified as land and severed as land from the estate of which it forms a part. Every case upholding the doctrine which I have been able to examine has that marked characteristic. (*Caldwell* v. *Fulton*, 31 Pa. St. 475 ; *Caldwell* v. *Copeland*, 37 id. 427 ; *Armstrong* v. *Caldwell*, 53 id. 284 ; *Scranton* v. *Phillips*, 94 id. 15 ; *Sanderson* v. *Scranton*, 105 id. 469 and 109 id. 588 ; *Fairchild* v.

*Fairchild*, 7 Cent. Rep. 873; *Montooth* v. *Gamble*, 123 Pa. St. 240; *Kingsley* v. *Coal & Iron Co.*, 144 id. 613; *Lazarus Estate*, 145 id. 1.) That feature seems to me to be not merely accidental or incidental but a vital and essential element of the doctrine as it is asserted and applied. But that feature does not exist in the present case. The broad words of the primary grant are indeed sufficient, within the cases cited, to carry title to the coal as land, but they are cut down, narrowed and restrained by the specific provisions which follow. It is not the mine as such, it is not the veins or strata as such, it is not the coal in place, it is not even the whole of the coal, which one party contracts to sell and the other party to buy, but only some unknown and indeterminate fraction or portion of the coal which no human power can locate or identify as land. It is mineral product not land which is the subject of the dealing. It is to be, first, such portion of the coal as shall prove to be "merchantable," and which equals in quality the average yield of the adjacent mines, the quality to be conclusively settled by the defendant's superintendent or other inspectors after it is mined: it is, second, to be such and so much as does not pass a screen with half inch meshes: it is to be, third, only so much as can be safely and economically mined: it is to be, fourth, so much merely as can be mined and cleaned without greater expense than the mining on adjoining properties requires: and it is to be, fifth, no more than it will be profitable to mine when the veins approach exhaustion. Further than that, if a "fault" is disclosed in the mine, which occurs when by some convulsion of nature the vein has been broken off and its continuity lifted or depressed so that earth and rock end the drift and must be cut through and removed to recover the vein, it is provided that the lessee need not remove it if the cost of the process shall exceed five hundred dollars, in which event the coal beyond the fault would not pass at all. The very terms of this description show that nothing was further from the purpose of the parties than a grant of coal as land, and that the defendant company could not lay its hand

upon any specified cubical mass of coal and say this is mine as land according to the description in the deed, for it could not know and nobody could know until a future determination what part or portion of the vein would really pass.

It will not meet the difficulty to say that these restrictive clauses bear only upon the amounts to be paid and the method of ascertaining those amounts. Nothing indicates that the defendant was to have any coal that it did not pay for, and so by its conclusive inspection could confiscate as below grade half the product of the mine; and the very terms used show that they describe not only what the company should pay for but also what it should " take." Thus : three possibilities are specified ; that some of the coal may not be merchantable ; or may be such as to require extraordinary expenses to mine or clean ; or demand a greater expenditure than the average of the adjacent mines ; in either or all of which events the contract provides that " the liability of the said party of the second part to mine, take and pay for said coal shall cease." In other words the contract does not cover or operate upon any such coal and the company is not liable to take it.

This clause suggests another difficulty in the way of treating the contract as a deed of land. · It shows that the title to the coal was to pass in the future and conditionally upon the existence of facts later-to be ascertained. Of course, it was absurd to provide that the company should not be liable to take a part of the coal when by force of the deed it took the whole at once and *in presenti* and absolutely in fee. All the terms of the instrument are inconsistent with an immediate passing of the title. What was to pass and what price should become payable were both adjourned to be settled by the developments of the future. The contract was executory on both sides. What and how much coal was to pass from the lessors and to the lessee was made dependent upon the revelations of the actual mining process, and what and how much was to be paid depended also upon future conditions. The thing to be sold and the price to be paid were each alike dependent upon subsequent events, and the contract was

therefore executory, and must be treated not as a deed into which no unexpressed covenants can be implied but as an executory contract the interpretation of which is open to clear and reasonable implications.

Having thus determined the nature of the contract we are required to consider whether the allegations of the complaint show an actionable breach of its terms. The lessee company agreed to pay as royalty twelve and one-half cents per ton upon all the coal of the prescribed quality which should be taken out of the mine; and further covenanted for a minimum royalty which alone should be obligatory by agreeing to take out ten thousand tons for the first and second year, and not less than twenty thousand tons in each year thereafter, and leaving itself free to mine more than that or not as its business interests and convenience should require. That provision was in the form of a minimum royalty, and is not exactly synonymous with a dead or sleeping rent, which is not a royalty at all, but a fixed sum of money payable as rent, and *prima facie* payable even after the mine is exhausted, (*R.* v. *Bedworth,* 8 East, 387), and even though the mine supposed to exist develops no mineral at all. (*Jefferys* v. *Fairs,* 4 Ch. Div. 448.) But since in the case at bar the minimum royalty was payable whether the mine was worked or not, the difference referred to is not important or practical for any present purpose. That minimum royalty has never been withheld, and the theory of the defendant is that its payment is the only contract obligation due to the plaintiff. What has happened according to the complaint is this: there were three veins of coal underlying the surface; the Diamond vein, about eight feet thick and about one hundred feet below the surface; the Fourteen-foot vein, lying one hundred and fifty feet deeper, and from ten to twenty feet thick; and the Clark vein, about eight feet thick, and lying at a depth of four hundred and fifty feet below the surface. The lessee pierced all three veins with the Marvin shaft, which it sunk near one end of the property leased. It struck the Fourteen-foot vein at its lowest point of depression, and where its thickness was greatest.

It inclined upwards on each side of the shaft, so that the removal of coal at that point involved an obvious tendency to a lateral as well as direct thrust upon the opening. The principal work of the lessee was done at this point and in this vein. The upper or Diamond vein should have been mined out first, but only a moderate quantity was taken out of that, and the Fourteen-foot vein was mined out under about seventy-five acres of the property leased. The complaint charges that this work was done with gross negligence and want of care; that the supporting pillars were robbed to the point of weakness, and insufficient masts or columns of wood supplied to support the roof; and as a consequence what is known as a "squeeze" occurred; the whole mass of superincumbent rock and earth and coal crashed down into the chamber, ruined the shaft, broke up and distorted the veins, mixed the coal in with the other material, utterly prevented access to the mines, whereby, as the complaint avers, the whole body of coal has become lost to the plaintiff. How true this is appears from other allegations. Before this destruction of the mine the defendant company had taken out since the completion of the Marvin shaft about seventy thousand tons of coal per year; in 1883 had taken out almost ninety thousand tons, and during the year 1886, up to September, when the "squeeze" occurred, had already taken out over forty-three thousand tons; since then, nothing, not even a pound. And now the defendant claims that the contract is unbroken so long as it pays the minimum royalty. It is abundantly disclosed that the plaintiff is not getting, can never get, what she would have received, what she expected to receive, what was the chief inducement to the contract, what the lessee expected to pay, and what in the ordinary course of business it would have paid, solely because of the negligent destruction of the mine. The loss has come from a cause which both parties assumed would not occur, and against which, for that reason, the lessor took no express covenant, and it is because the lessee did not expressly covenant that it would not wilfully or negligently incapacitate itself from taking out more than the minimum quantity of coal per year that it grounds its contention.

There is no such express stipulation, but I think one is to be implied, and fairly and justly may be found interwoven with the terms expressed, and growing out of their scope and meaning. In *M'Intyre* v. *Belcher* (14 C. B. Rep. [N. S.] 654) the plaintiff sold out his business as a surgeon, getting in return a cash payment for his drugs and instruments of about £17, but taking an agreement that the purchaser would account for and pay over to the plaintiff the one-fourth part of the receipts of the business for four years, if he should live so long, provided that their annual aggregate should reach £300. The defendant during the third year chose to abandon the business and the plaintiff sued. There was no express agreement that the purchaser would continue the business, or that if he did that its annual proceeds would reach £300. The court held that a covenant was implied that the defendant would not wilfully incapacitate himself from carrying on the business. Of course that plaintiff took the risk, beyond the payment in cash, of the defendant's business capacity, of his tact and skill, of his industry and ability to gather in more than the annual £300, but the risk he did not take was of the wilful or negligent abandonment by the defendant of any effort to do business at all, so that the earning of profits was rendered utterly impossible. And so here, the lessor, beyond her minimum royalty, took the risk of the defendant's business capacity and necessities, of its judgment of markets, of its ability to sell and find customers for the product, of the demands of its own interest and welfare; but the risk she did not take was that the lessee should make royalties beyond the minimum absolutely impossible by a total destruction of the mine out of which the royalties were to come, and that through the agency of its own wilful or negligent act. The plaintiff took a chance undoubtedly; but she was entitled to have it and to have it as she took it; bad enough at the best, but such as it was, her's; and which the defendant was not at liberty wilfully or negligently to destroy.

I know very well that implied promises are to be cautiously and not hastily raised. What they are was very well stated

in *Scranton* v. *Booth* (29 Barb. 174), in *Allamon* v. *Mayor of Albany* (43 id. 36), and in *Booth* v. *Cleveland Rolling Mills Co.* (6 Hun, 597). They always exist where equity and justice require the party to do or to refrain from doing the thing in question; where the covenant on one side involves some corresponding obligation on the other; where by the relations of the parties and the subject-matter of the contract a duty is owing by one not expressly bound by the contract to the other party in reference to the subject of it. In this court we have thrown some safeguards about the doctrine to secure its prudent application, and have said that a promise can be implied only where we may rightfully assume that it would have been made if attention had been drawn to it, (*Dermott* v. *The State*, 99 N. Y. 101), and that it is to be raised only to enforce a manifest equity, or to reach a result which the unequivocal acts of the parties indicate that they intended to effect. (*King* v. *Leighton*, 100 N. Y. 386.)

It seems to me that within the rule of these cases the plaintiff has a right of action upon the implied promise of the defendant not wilfully or negligently to incapacitate itself from taking out more than the minimum quantity of coal. The acceptance of a minimum royalty for the safety and benefit of the lessee equally with that of the lessor, when a larger one was contemplated on both sides, involves an obligation of the lessee not wilfully or negligently to prevent the expected accruing of the greater royalty. For, examine the situation at the making of the contract. The plaintiff owned a tract of coal land, the veins under which held about four millions of tons, which at twenty thousand tons a year it would take two hundred years to exhaust, and worth at the small price of this contract, above the mining and marketing and the operator's profits, half a million of dollars. She desired to utilize so valuable a property. Unable or unwilling to plant a colliery upon the land she turns to the defendant. That is a rich and powerful corporation engaged both in mining and transportation. It had mines adjacent, adequate and sufficient plants, large capital, numerous customers, complete control of transportation. The

parties sat down to agree. The rate per ton as royalty and the quality and inspection of the coal were settled. Then came the vital inquiry of how much the company would bind itself to mine. It said twenty thousand tons per year. Of course it proposed and expected to mine much more than that, and its own business interest would impel it to mine more, but it would not be bound for more than twenty thousand tons. Imagine Mrs. Genet reflecting on the proposition. As an offer to mine twenty thousand tons per year and no more, she would instantly have refused it. A contract to run for two hundred years was not to be endured, but as an offer to mine at least twenty thousand tons per year, and as much more as the company, with due regard to its business interests and convenience, would take out, the offer was better and not to be curtly rejected. It would be taking a chance, yes; but business largely consists in taking chances, more or less hopeful or perilous. Mrs. Genet studies this chance. It involves within its possibilities the chief and principal and only tolerable consideration of her bargain. She measures that chance narrowly. She reasons; there is the coal, I know it; I am sure of its quality; these men will want it; to get out the twenty thousand tons they will need to sink a shaft, to put up pumps, to establish a plant; having done so much, their own interest will impel them not to stop at the minimum; they never will stop there, and I will take the chance. Suppose somebody had said to her, they may wilfully or negligently destroy your mine, and, with her attention drawn to that suggestion, she had asked the company to agree that it would not do that, is there any doubt that it would have so promised, or that if it deliberately refused that Mrs. Genet would have declined a contract with such a destructive possibility within its admitted scope? But neither party thought of it; both would have deemed it an absurd suggestion. There is not the least doubt of the manner in which Mrs. Genet viewed the chance offered to her, of the measure which she took of it, of its boundaries in her mind, nor that the company which held it out to her knew how she regarded it, and understood it in the

same way on its part. The equity of an implied promise is strong and clear. Good faith, honest dealing, business candor and fairness require that this contract should be enforced in the sense and with the meaning which was in the mind of both parties at the time of its execution. The mine which was to be exhausted and paid for as exhausted, is to-day as much exhausted as if every ton of coal had been taken out and sold. To the plaintiff there is no difference. In either event the coal is gone: and to say that she shall be paid for it at the annual rate of twenty-five hundred dollars a year for two hundred years is to put upon her a contract which she never made and never dreamed of making, and which never entered the mind of the defendant itself until the "squeeze" in the mine suggested an equally destructive pressure of literal construction.

The view which I have taken of this case was foreshadowed in the opinion of BARRETT, J., when this contract was before him in another action. He declared that "the conduct of the defendant has been entirely subversive of the spirit of the contract and of the object and purpose for which it was entered into:" that "the execution of the contract in good faith was fully contemplated:" that "defendants have acted as if a minimum rent was in the nature of an annual bonus paid to the plaintiffs merely to keep the property out of the market, or to prevent it falling into the hands of a rival:" that "they certainly have no right to make any such use of the contract, and that would be to ignore its essence and destroy its life." The learned judge in these remarks touched the vital point of this controversy and disclosed his appreciation of the equity inhering in plaintiff's claim.

The question here is not one of waste or of injury to real property, or even of a tort or a wrong. It is whether, under this contract, fairly and justly construed between the parties, there was an understood consideration for it, beyond the minimum royalty secured, in the business option and choice of the lessee to mine a much larger amount if, under the existing circumstances, it should think proper to do so. I think there

was. I can readily see that it served as the determining motive on the part of the plaintiff to the making of the contract. Corporations follow their interests as they should: What the defendant's interest would be Mrs. Genet knew: and when she took the risk of what it would do, of its reserved option, she was entitled to have it, and not bound to submit to its utter destruction. To-day, if by a miracle the mine could be restored, she would still be obliged to submit to the option, and we should tell her that she must do so; but the profit in the coal, with all the machinery at hand, the plant existing, the miners near by, the trains waiting for their loads, would make almost certain its exercise, so as to produce the expected royalties far beyond the minimum. The chance of that option, exercised as both parties understood it should be, fairly and honestly and in good faith, was of great value to Mrs. Genet, but the lessee has destroyed it utterly by its own negligent act. In so doing, we think it broke the contract, and therefore, that the complaint stated a good cause of action.

The order and judgment of the General Term should be reversed, and that of the Special Term, overruling the demurrer, affirmed with costs, but with leave to the defendant to answer within twenty days from notice of the entry of judgment, and upon payment of all costs which have accrued since the interposition of the demurrer.

All concur, except EARL, J., not voting.

Ordered accordingly.

# MEMORANDA

*CAUSES DECIDED DURING THE PERIOD EMBRACED IN THIS VOLUME, WHICH ARE NOT REPORTED IN FULL.*