(13 Misc. Rep. 409.)

GENET v. PRESIDENT, ETC., OF DELAWARE & H. CANAL CO.

(Superior Court of New York City, Equity Term. June, 1895.)

1. ACTION REGARDING LAND IN SISTER STATE—JURISDICTION.

The courts of New York will not, on a bill to rescind a contract in relation to land in Pennsylvania, decree that defendant remove his machinery from the land, and deliver possession of the land to plaintiff.

2. SAME—CONSTRUCTION OF MINING LEASE—LAWS APPLICABLE.

The rights of the parties under a mining lease of land in Pennsylvania must be determined by the laws of that state, though the lease was made at the residence of the parties in another state.

3. SAME—DECISIONS OF SISTER STATE—PROOF OF.

The question of how the courts of another state have construed mining leases is one of fact, on which testimony of jurists as experts is admissible.

Action by Augusta G. Genet against the president, managers, and company of the Delaware & Hudson Canal Company to rescind a contract, recover possession of land, and for an accounting and injunction. Judgment for defendants.

The contract in suit is as follows:

"Memorandum of agreement made and concluded this 28th day of March, A. D. one thousand eight hundred and sixty-four (1864), between George C. Genet and Augusta G. Genet, his wife, of the city, county, and state of New York, of the first part, and the president, managers, and company of the Delaware & Hudson Canal Company, of the second part, witnesseth: That the said parties of the first part, for themselves, their heirs, executors, administrators, and assigns, as well as for and in consideration of the covenants and agreements hereinafter mentioned, to be kept and performed by and on the part of the said party of the second part, as, for, and in consideration of the sum of one dollar, to each of them in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged, hath leased and doth hereby lease unto the said the president, managers, and company of the Delaware & Hudson Canal Company, their successors and assigns, all the coal contained in, on, or under that certain piece or parcel of land situate, lying, and being in the borough and township of Providence, county of Luzerne, and state of Pennsylvania, described as follows, to wit: [Description of property.] Said coal supposed to be contained in the veins known and distinguished as the 'Diamond,' 'Fourteen Foot,' and 'Clark' veins, but in any event to include all the coal that can be economically mined or taken out from the above-described premises, together with the right to enter upon and into said lands, and to dig and mine and remove said coal through or out of any shafts, slopes, or tunnels they may dig, erect, or construct upon the premises. And the said parties of the first part further hereby lease and grant to the said party of the second part, their successors and assigns, without charge, the right of way for all railroads, turnouts, switches, slopes, tunnels, mine roads, wagon roads, ditches, and drains they may find it necessary to construct across or upon said tract, with the right to erect drains upon the surface for the proper mining of said coal; also the use of land for digging all air shafts that they may consider necessary, with the right to dig the same; and also the use of all land they may require for the purpose of erecting repair shops or any other shops and buildings they may deem necessary for the prosecution of their business; together with land for piling coal or culm, and all other appurtenances they may require for mining, receiving, removing, cleaning, screening, dumping, storing, preparing, and forwarding the coal to be mined under this agreement; together with the right to take without charge, by quarrying or otherwise, from the said land, all the stone, earth, and other materials they may find it necessary to use in the erection of their buildings or in the construction of their railroad and other appurtenances. The said party of the second part shall not be held accountable under any

circumstances for any damage that may be done to the surface of said land by the mining, preparing, and removing said coal. And the said party of the second part, their successors and assigns, doth hereby promise and agree to mine from said land in the year one thousand eight hundred and sixty-four not less than ten thousand tons of coal, in the year one thousand eight hundred and sixty-five not less than ten thousand tons, and twenty thousand in each and every year thereafter. It being understood that the said party of the second part is to pay for ten thousand tons in each and every year, whether the same shall be actually taken out in such year or not, and that in case the maximum quantity of twenty thousand is not taken out in one thousand eight hundred and sixty-six, or any subsequent year, interest at the rate of seven per centum per annum shall be paid by the said party of the second part to the said party of the first part, their heirs or assigns, upon such sums as the deficiency shall amount to, said interest to be continued until the full quantity agreed to be taken out as aforesaid shall be reached: provided, that the said party of the second part shall not have been relieved from liability to mine said coal in whole or in part, as is hereinafter mentioned: and provided, further, that the said party of the second part shall have the privilege of taking out without charge at any time thereafter a quantity of coal equal in amount to the deficiency they may have paid for in any previous year or years. And it is further agreed that if the coal in any of the veins shall not prove to be of a merchantable quality, or if it becomes impracticable to mine the same in consequence of extraordinary expenses in mining and cleaning said coal, or if the veins should prove to be of such quality and thickness that the coal cannot be mined and prepared for market without greater expense than is bestowed upon coal taken from the same veins in the mines of the party of the second part for the time then being, then the liability of the said party of the second part to mine, take, and pay for said coal shall cease. And it is further understood and agreed that in case the quantity of coal mined and taken out in any year shall fall below the quantity agreed to be taken out in such year, in consequence of the unmerchantable quality of the coal in any of the veins, or in consequence of increased expense and difficulty in mining and cleaning the said coal, as hereinbefore recited, or in case the said land shall become so far exhausted as to render it impracticable or unprofitable to mine the stipulated quantity in any one year, then, in either case, the said party of the second part are only to pay for the quantity of coal that can be safely and economically taken out.

"And the said party of the second part agree to pay for the coal mined and taken out in pursuance of this agreement at the rate of twelve and a half cents (12½) for every ton of (2,240) twenty-two hundred and forty pounds of clean, merchantable coal, exclusive of culm or mine waste that will pass through a mesh of one-half inch square. Payments to be made monthly, in cash, for coal mined during the preceding month, to the said parties of the first part, their heirs and assigns, at the pay office of the said party of the second part. The said party of the second part shall erect scales in their railroad track at some convenient point near the mines, which scales shall be mutually approved. That in weighing said coal an allowance shall be made sufficient to compensate for ice or snow that may be on the coal cars and for wet coal; and any number of pounds in the weight of a car of coal less than one hundred shall not be counted, and any fractional part of a hundred pounds in weight of a car shall be counted as one hundred pounds in deducting the weight of the car. The account of such weight shall be open to the inspection of both parties. And it is further understood and agreed that, if the said party of the second part elect to do so, they may increase the quantity beyond that stipulated to be mined in any one year, and at their option may diminish the quantity for any succeeding year or years by an amount corresponding with such increase: provided, that the quantity mined shall not be less in the aggregate than is hereinbefore stipulated. And it is further agreed that, in the event of a fault occurring in the said mines, or in any of the veins of coal to be worked under this agreement, the said party of the second part may give notice of such fault to the said parties of the first part, their heirs or assigns, when they, the said parties of the first part, their heirs or assigns, may elect either to abandon that portion of the work or vein in which the

said fault occurs, or to direct the said party of the second part to drive through the said fault, paying to the said party of the second part all the expenses necessarily incurred in so doing over and above the sum of five hundred dollars (500), it being understood that the said party of the second part are to pay the whole cost of driving through or removing any such fault, when such cost does not exceed five hundred dollars (500): provided, however, that the said party of the second part shall not be required by said parties of the first part, their heirs or assigns, to drive through or remove any such fault against the judgment or advice of the mining engineer of the said party of the second part, except on the following conditions, to wit: The said parties of the first part, their heirs or assigns, may make request in writing to have said party of the second part drive through or remove such fault in opposition to the advice of said mining engineer of the said party of the second part, when the said party of the second part shall proceed in the work of endeavoring to remove such fault, and shall continue until the said parties of the first part shall decide to abandon said work, when, if the 'fault' be not overcome, the said parties of the first part, their heirs or assigns, shall pay the said party of the second part the whole cost of prosecuting said work.

"It is further mutually understood and agreed that the term 'merchantable coal' shall be understood and defined as follows, to wit: That all coal mined under this agreement shall be, with the same expense of mining and cleaning, of as good quality as the average of coal taken from other mines of and sent to market by the said party of the second part, and that it shall be subject to the inspection of the superintendent of the said party of the second part, or such other person as they may employ for that purpose, whose decision as to the quality of said coal shall be final and conclusive.

"And it is further agreed and understood that the party of the second part, their successors and assigns, may use and occupy the rights and privileges hereby granted, and the openings, buildings, fixtures, and appurtenances made and constructed by them for the mining, preparing, and forwarding coal under this agreement, for the mining, preparing, and forwarding coal from any adjoining or contiguous lands, until all the lands that they desire to take coal from and that can be mined and taken out through said openings, shafts, and slopes shall be exhausted. That the party of the second part, their successors or assigns, shall have the right to rebuild, reconstruct, or remove any or all of the buildings, fixtures, machinery, appurtenances, and improvements during the continuance of this agreement, and until the coal in the adjoining and contiguous lands that can be worked from their openings, shafts, and slopes and tunnels shall have been worked out. The removal of buildings, fixtures, and appurtenances to be made within a reasonable time after the land shall have been exhausted. That the parties of the first part, their heirs and assigns, shall pay all taxes on lands hereby leased, and the party of the second part, their successors and assigns, all taxes on their buildings and improvements."

The answer admits the making of the contract, and denies all the materials allegations of the complaint, and, as a second defense, defendants pleaded res judicata.

As a third defense defendants pleaded that the land described in the contract is situated in Pennsylvania, and that all the covenants in the said contract were to be performed there; and that by the common law the said instrument in writing was a valid and executed deed of conveyance from plaintiff to defendants of all the coal contained upon, within, or under the tract of land described in it; that defendants have fully complied with all the conditions of said deed. And defendants also pleaded the statute of limitations, and that plaintiff has an adequate remedy at law.

° George C. Genet, for plaintiff.
Matthew Hale and Frank E. Smith, for defendants.

McADAM, J.  The decision by the Second division of the court of appeals (122 N. Y. 505, 25 N. E. 922) authoritatively settles the law of this case (Cluff v. Day, 141 N. Y. 580, 36 N. E. 182; Williamsburgh Sav. Bank v. Town of Solon, 136 N. Y. 477, 32 N. E. 1058; Terry v. Wait, 56 N. Y. 91), and is conclusive as establishing in the defendants: (1) The right to use the shaft and breaker to mine coal from the surrounding lands concurrently with the mining in the Genet land.  122 N. Y. 524, 25 N. E. 922.  (2) The right to connect the workings in the Genet land with the workings in the surrounding lands.  122 N. Y. 526, 530, 25 N. E. 922.  (3) The right to drain water to the Marvine shaft, and thence pump it to the river.  122 N. Y. 527, 528, 25 N. E. 922.  (4) The right to pile the culm on the surface of plaintiff's land.  122 N. Y. 525, 25 N. E. 922.  (5) The right to mine from the farm.  122 N. Y. 526, 25 N. E. 922.  (6) The right to maintain and use the shaft, breaker, and other structures as they were in 1886, and now are.

There is nothing in the judgment or opinion of the court of appeals in the subsequent action reported in 136 N. Y. 602, 32 N. E. 1078, which in any way qualifies or limits what was actually decided by the Second division.  In considering what was actually decided by that court, Judge Finch says:

"The first cause of action failed because there was no proof, except that offered by parol, of the assumption by defendant of any such obligation; and the second, because whatever was done was held to be within the explicit terms of the contract itself.  Thus the right to use the shafts and machinery on plaintiff's land in aid of mining operations on adjoining lands was held to be expressly given as a present right by the terms of the instrument; the right to pile culm and waste upon the surface was found in its express permission; and the right of drainage through the gangways opened to other shafts to the lower point of the Marvine shaft, to be thence pumped out to the river, was deduced from the terms and conditions of the contract."

The plaintiff's right to relief depends upon whether the defendants have been guilty of acts which put an end to the contract, and entitle the plaintiff to judgment declaring the contract terminated.  Most of the acts complained of are referred to in the decision cited (122 N. Y. 503, 25 N. E. 922), and were held to be privileges which the defendants acquired under the contract, and had a right to exercise.  The plaintiff's right has in this manner been reduced to the allegation that the coal upon her land has been exhausted within the meaning of the contract, which has by its terms expired.  As matter of fact, it clearly appears that the coal upon the plaintiff's land has not been exhausted, and there is no equitable ground upon which the contract can on that theory be held to be at an end.  Indeed, until the coal upon the plaintiff's land is, in point of fact, exhausted, the contract by its terms is to continue, and this whether the defendants mine coal upon the plaintiff's land, or entirely cease mining operations thereon.  The contract expressly permits the cessation of mining on plaintiff's land by providing that, if no coal be mined thereon, the defendants shall make to her a payment for 20,000 tons a year; and so long as they make this payment they are, under the agreement, entitled to use and enjoy the rights and privileges granted, and the openings, buildings, fixtures, and appurtenances made

and constructed for mining, preparing, and forwarding coal on plaintiff's land, as well as for mining, preparing, and forwarding coal from the adjoining or contiguous lands. The right to use the plaintiff's land for the mining of coal on adjoining and contiguous land is not limited by the agreement to any particular time. It is to continue until the coal on the contiguous land is exhausted. It does not depend upon the amount of coal taken from the plaintiff's land. To insert in the contract a provision that this right shall not be exercised till all the coal on plaintiff's land is mined would be to make a new contract for the parties, and not construe the one already made. The rights assumed by the defendants were either expressly conferred by the contract or were incidental to their exercise, and therefore necessarily implied. Some of the acts charged might, if wrongfully performed, furnish ground for legal action. They do not rise to the dignity of breaches which would authorize the court to declare the contract judicially rescinded. Such a determination, with a decree requiring the defendants to remove from the lands all their apparatus, etc., and to surrender the premises to the plaintiff, would, in effect, be to enforce an action of ejectment from lands in Pennsylvania,—a jurisdiction which this court could not assume; the rule being that actions for the possession of real property must be brought in the forum rei sitæ. Equity acts in personam where the parties are within the jurisdiction of the court, though the lands be in another state, but not to the extent of awarding relief more appropriately obtainable in a common-law action of ejectment triable by a jury of the vicinage.

Without going further, these conclusions lead to a dismissal of the plaintiff's bill. But the importance of the issues presented suggests another proposition requiring notice. The defendants claim that the contract relates to coal in place, and concerns property in immovables, and that all questions touching such property and the forms of conveying it are governed by the lex situs. Westl. Priv. Int. Law, § 156; Whart. Confl. Laws, § 273; Story, Confl. Laws, § 424. This presents the question of title under the agreement. Blackstone, in his Commentaries (Cooley's Bl. Comm. p. 18), says:

"Land hath also, in its legal signification, an indefinite extent, upwards as well as downwards. 'Cujus est solum, ejus est usque ad cœlum,' is the maxim of the law. Upwards, therefore, no man may erect any building, or the like, to overhang another's land; and downwards, whatever is in a direct line between the surface of any land and the center of the earth belongs to the owner of the surface, as is every day's experience in the mining countries. So that the word 'land' includes not only the face of the earth, but everything under it or over it. And, therefore, if a man grants all his lands he grants thereby all his mines of metal and other fossils, his woods, his waters, and his houses, as well as his fields and meadows."

In mining districts parties may, and frequently do, sever the ownership of the surface from that of the underlying mines. MacSwinney on Mines (page 27) says:

"The right of property in the surface and in the underlying mines may be shown to be in different hands. Nothing is more common than to sell or demise a piece of land excepting the mines, or to sell or demise a piece of land excepting the surface. * * * In like manner the different strata of the sub-

soil may be shown to be the subjects of different rights. Where the surface and the underlying mines, or the different strata of the subsoil, are differently owned, they are separate tenements, with all the incidents of separate ownership. And the mines or each stratum may be held in fee simple or fee tail or otherwise, as in the case of surface property."

See, also, 2 Broom & H. Comm. 16.

Where coal is severed from the freehold it may, like timber or other product of the soil, become personal property; and no one would claim that a ton of Pennsylvania anthracite coal on a wharf or in a coal yard would be regarded, for legal purposes, as Pennsylvania land. But where, as in this instance, the contract relates to coal buried in the earth, and forming part of it, and the right to it is exclusive in the grantee, it must, for legal purposes, be regarded as real estate. The proposition that the law of the place where real property is situated determines all questions relating to its transfer is elementary. The correct application of it to the present case has, however, given rise to differences of opinion. The theory of the plaintiff is that the instrument is an executory contract, personal in its nature, formally executed in the city of New York by the plaintiff, a resident thereof, and by the defendants, a domestic corporation; and that it is to be construed with reference to the law of New York alone. The defendants claim that it is an executed conveyance of land, and as such governed by the laws of Pennsylvania. To which law, then, must reference be had to determine the character of the instrument? The rule which subjects a contract made in one state concerning land in another state to the law of the place where the land is situated is not confined in its operation to the formal execution of the deed, but extends to and includes all questions as to its construction and interpretation. Nicholson v. Leavitt, 4 Sandf. 252, 276; Monroe v. Douglass, 5 N. Y. 447; Abell v. Douglass, 4 Denio, 305; McGoon v. Scales, 9 Wall. 23; Brine v. Insurance Co., 96 U. S. 627, 636. Not only must resort be had to the lex situs to determine the construction and legal effect of a deed, but also to determine whether the subject-matter of the instrument is real or personal. Chapman v. Robertson, 6 Paige, 627, 630. See, also, Holbrook v. Bowman, 62 N. H. 313; Bronson v. Lumber Co., 44 Minn. 348, 46 N. W. 570. The question, being one of foreign law, must be determined by the court upon the evidence presented in the same manner as any other question of fact. Code, § 942; Monroe v. Douglass, 5 N. Y. 447; Kline v. Baker, 99 Mass. 254; Ufford v. Spaulding, 156 Mass. 65, 30 N. E. 360; Concha v. Murrieta, 40 Ch. Div. 543. In Nelson v. Bridport, 8 Beav. 527, Langdale, M. R., says:

"The rule of English law that no knowledge of foreign law is to be imputed to an English judge sitting in a court of only English jurisdiction is undoubtedly well founded. And as cases arise in which the rights of parties litigating in English courts cannot be determined without ascertaining to some extent what is the foreign law applicable to such cases, the foreign law and its application, like other results of knowledge and experience in matters of which no knowledge is imputed to a judge, must be proved, as facts are proved, by appropriate evidence,—i. e. by properly qualified witnesses, or by witnesses who can state from their own knowledge and experience gained by study and practice, not only what are the words in which the law is ex-

pressed, but also what is the proper interpretation of those words, and the legal meaning and effect of them as applied to the case in question."

The true rule to follow in cases depending on the laws of a particular state is to adopt the construction which the courts of that state have given to those laws. Ang. Lim. (6th Ed.) § 24; Elmendorf v. Taylor, 10 Wheat. 152, 159; Bell v. Morrison, 1 Pet. 351, 360; Leffingwell v. Warren, 2 Black, 599. The reason for the rule is that the courts of every state and country must be presumed. to be the best expositors of their own law and of the terms of contracts made with reference to them; and as Judge Story observes:

"No court professing to be governed by principle would assume the power to declare that a foreign court misunderstood the laws of their own country."

Judge Gray, in Kline v. Baker, supra, says:

"When the evidence consists of the parol testimony of experts as to the existence or prevailing construction of a statute, or as to any point of unwritten law, the jury must determine what the foreign law is, as in the case of any controverted fact depending upon like testimony [citing cases]. When the evidence admitted consists entirely of a written document, statute, or judicial opinion, the question of its construction and effect is for the court alone."

See, also, Ufford v. Spaulding, supra.

Whether the proof of the foreign laws must be made to the court rather than the jury, as intimated by Greenleaf (volume 1, § 486), and incidentally in the notes to Phillips on Evidence (volume 2, pp. 433, 434), is of no consequence, as the trial here is by the court alone. The oral testimony of witnesses learned in the peculiar system of law to be proved is competent as showing what the real rule is, as the result, not of one particular statute or decision, but of the whole course of exposition, interpretation, and adjudication. Baron de Bode's Case, 8 Q. B. 250. In Trimbey v. Vignier, 6 Car. & P. 25, Bosanquet, J., expressed the opinion that, if a foreign statute has received a thorough local construction by repeated judicial decisions, a professional witness of the foreign country may be asked what is the law on that subject. This, notwithstanding the rule that the statute or written law of foreign states should be proved by the law itself. The unwritten law may always be proved by witnesses instructed therein. Francis v. Insurance Co., 6 Cow. 429; Wood, Prac. Ev. § 209. The Code of Civil Procedure (section 942) expressly provides that "the unwritten or common law of another state, or of a territory, or of a foreign country, may be proved, as a fact, by oral evidence." Books of reports and judicial decisions are considered part of the unwritten or common law. 1 Cooley's Bl. Comm. p. 63; 2 Phil. Ev. (Cow. & H. Notes) p. 435; Code, § 942. The expert testimony, when received, cannot be arbitrarily disregarded, but, like other competent evidence, must be considered and accorded that respect and probative force its character and weight require.

The Second division of the court of appeals (122 N. Y. 527, 25 N. E. 922) held that:

"The words of the contract under consideration which operate to convey the coal are that the parties of the first part 'doth hereby release unto the said' party of the second part 'all the coal contained in, etc., together with the

right to enter upon said lands, and dig, mine, and remove said coal'; and the legal effect of such conveyance was to vest in the defendant an estate in fee in the coal as a separate piece of land."

The First division of the court of appeals, in construing the same agreement (136 N. Y. 593, 32 N. E. 1078), held that it did not operate as a conveyance of the coal veins or strata; that its subject-matter was mineral product, not land; and that the contract was executory in its nature. In this instance the question came up on demurrer to the complaint, so that the law of Pennsylvania was neither pleaded nor proved, and the construction placed upon the agreement was one purely of law, not depending, as now, upon expert evidence, which introduces a new element,—i. e. one of fact. The last-mentioned judgment is in no respect an adjudication upon any question of fact, and the court that rendered it seems prompt to reject the plea of res adjudicata, even with respect to its own judgment, when, upon a second trial, a different state of facts is developed. Mygatt v. Coe, 142 N. Y. 78, 85, 36 N. E. 870; Gray v. Green, 142 N. Y. 316, 319, 37 N. E. 124. New facts may present an old case in a form requiring the application of principles so essentially different from those applied in a previous instance as to lead to results directly opposite to those arrived at in the previous record. In 122 N. Y. 505, 25 N. E. 922, the case came before the Second division on the facts; and, as the facts on both sides were presented, the court was not limited by the allegations of the complaint and those alone. On this trial the defendant pleads the law of Pennsylvania as a fact, and has proved it by the testimony of judges on the bench of the highest court in that state, to wit, Chief Justice Paxson, Judges Hand and Heydrick,—jurists who have taken part in some of the decisions of that state determining the rights of parties under what are known as "coal leases,"—and these experts agree that the particular instrument in controversy, tested by the rules of Pennsylvania law, is a conveyance in fee of the coal in place as land, and that immediately on its delivery title to the coal vested in the defendants. They testify that the tests which determine a particular instrument to be a conveyance in fee of the coal as a parcel of land are: (a) It must relate to all the coal. (b) The right to mine and take the coal must be exclusive of the grantor. (c) The grantee must agree either to mine all the coal or pay for it if not mined. If the instrument in question contains these characteristics, it is, in legal effect, a grant in fee of the coal as land. For the purposes of these rules, the word "lease" is deemed an apt word of conveyance. The contract in question contains the three elements stated by the experts, and is, according to their testimony, clearly a grant in fee. Whether it is to be denominated a base or terminable fee—that is, an estate which ends as the coal is removed—is of no consequence, so far as the determination of the present contention is concerned. The law of Pennsylvania as to the construction and effect of coal leases has been worked out step by step by the courts of that state in a long line of decisions. It is not our purpose to construe these, but to accept the interpretation placed upon them by experts best

qualified to judge of their legal effect and meaning. This court would hesitate to put its opinion as to the law of Pennsylvania against the weight of evidence thus offered, and on this testimony and the reported decisions produced it finds, as matter of fact, that the law of Pennsylvania is, as stated by the experts produced by the defendants, that the instrument sued on is a grant, and not a mere executory contract, as asserted by the plaintiff. The books of cases adjudged in a foreign state are presumptive evidence only of the unwritten or common law thereof (Code, § 942); and such presumption, like any other, may be rebutted, limited, or explained by other competent or more reliable proof. The expert evidence has been considered with reference to the reported adjudications, and no inconsistency impairing its value has been found. Indeed, the construction placed upon the law of Pennsylvania by the jurists who testified to such law agrees with the opinion expressed by our own Second division, which is some evidence at least of its reliability.

The plaintiff does not seek to reform the contract, nor to compel the defendants to a more energetic performance on their part, but to terminate their rights under it, and compel them to surrender possession of the property by enforcing the performance of acts which would accomplish that result. She is not entitled to the equitable relief claimed, and for the reasons stated the complaint must be dismissed upon the merits, with costs.

Complaint dismissed, with costs.