## STOTESBURY v. HUBER et al.

### (District Court, E. D. New York. September 16, 1916.)

**1. COURTS ⬡489(13)—JURISDICTION OF FEDERAL COURTS—SUITS RELATING TO ESTATES.**

A federal court has jurisdiction to determine the right of one to a share in the estate of a decedent as an heir, the limitation or extent of his share, and rights under an assignment as betweeen the parties, but not to settle the estate or direct distribution.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 1325; Dec. Dig. ⬡489(13).]

**2. COURTS ⬡312(1)—JURISDICTION OF FEDERAL COURTS—SUITS BY ASSIGNEE.**

A suit by the assignee of an interest in the distributive share of an heir in the estate of a decedent, to establish such interest and enforce his assignment, is not within Judicial Code, § 24 (Act March 3, 1911, c. 231, § 24 [1], 36 Stat. 1091; Rev. St. § 629 [Comp. St. 1913, § 991]), relating to jurisdiction of federal courts of suits by assignees of choses in action, since the interest of the heir is not a chose in action, but a beneficial interest not arising out of contract, and where the necessary diversity of citizenship exists between the parties to the suit the court has jurisdiction.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 873–875; Dec. Dig. ⬡312(1).]

**3. COURTS ⬡312(1)—JURISDICTION OF FEDERAL COURTS—CITIZENSHIP OF PARTIES.**

Defendant, in consideration of money advanced to him by a partnership, agreed to assign an interest in his share of an estate. He executed an assignment in the name of the firm which was designated therein as a corporation. At the request of the firm, he executed a second assignment in lieu of the first to one of the partners as an individual. The assignee afterward repaid the money advanced to the firm and brought suit to establish and enforce the assignment. *Held*, that defendant was in no position to question the assignee's right to maintain the suit in his own name, and that, he and defendant being citizens of different states, a federal court had jurisdiction regardless of the citizenship of the other members of the firm.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 873–875; Dec. Dig. ⬡312(1).]

**4. WILLS ⬡743—RIGHTS OF DEVISEES AND LEGATEES—VALIDITY OF ASSIGNMENT OF INTEREST.**

An assignment of a definite sum of money out of the assignor's share in an undivided estate, consisting of real and personal property, devised and bequeathed by a will containing a power of sale to the executors or trustees, if otherwise legal, is valid and enforceable.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1907–1910; Dec. Dig. ⬡743.]

**5. USURY ⬡18—WILLS ⬡743—ASSIGNMENT OF INTEREST BY BENEFICIARY—LEGALITY—CONSTRUCTION OF CONTRACT.**

Defendant, a resident of New York and married, as an heir of his deceased mother, was entitled to a share in the estate of his grandfather, subject to the life tenancy of his grandmother. The estate consisted of real and personal property located in New York and in the hands of executors and trustees who were accountable to the Surrogate's Court. Being in straitened circumstances and in need of money, he applied to various parties for a loan on the security of his interest in the estate. The loan was refused, but after negotiations through an agent to a firm in Philadelphia, of which complainant was a member, an agreement was

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

made for the sale by defendant of a definite amount of his share in the estate and he executed an instrument by which, in consideration of $23,500 paid to and disbursed for him, he assigned to complainant $50,000 of his share of the estate, with interest after the death of the life tenant. The life expectancy of the life tenant was at that time about nine years, and she in fact died within four years, whereupon complainant brought suit to establish his rights under the assignment. *Held* that, although the contract was made in Pennsylvania, the rights of the parties under the assignment were governed by the law of New York where the property was located and where alone it could be enforced; that by such law, while the assignment was in form and was intended by the parties to be one of sale, and while the facts do not justify a finding that it was merely a loan and an attempted evasion of the usury statutes, nevertheless, the amount assigned being largely in excess of the amount paid with legal interest during the life expectancy of the life tenant, it was unconscionable and inequitable under the law of New York, and would be denied enforcement by a court of equity on condition that defendant pay to complainant the amount advanced with legal interest and such sum for expenses and profits as should be fixed by the court.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 31–34, 36–38, 40; Dec. Dig. ☞18; Wills, Cent. Dig. §§ 1907–1910; Dec. Dig. ☞743.]

In Equity. Suit by Edward T. Stotesbury against Joseph Huber, Louis D'Esterre, and others. Decree for defendants on conditions:

Winthrop & Stimson, of New York City (Dickson, Beitler & Mc-Couch, of Philadelphia, Pa., and Henry L. Stimson and George Roberts, both of New York City, of counsel), for plaintiff.

Steuart & Perry, of New York City (James L. Steuart and Frank S. Moore, both of New York City, of counsel), for defendants Louis D'Esterre and Anna W. D'Esterre.

Oscar A. Lewis, of Brooklyn, N. Y., for defendant William H. D'Esterre.

John F. Clarke, of Brooklyn, N. Y., for Huber Estate.

CHATFIELD, District Judge. The plaintiff holds a deed or assignment of a share amounting to $50,000 (and interest from the date of the death of the life tenant) of the vested remainder which the defendant Louis D'Esterre received upon the death of his mother, who was a daughter and one of the beneficiaries under the will of Otto Huber, deceased. This assignment, dated the 30th day of November, 1910, was executed in New York and transmitted, after record in the counties of New York and Kings, to Philadelphia, in the place of a previous assignment which had been executed by the defendant Louis D'Esterre, and by his wife, and which had been turned over in the city of Philadelphia to the firm of Drexel & Co. in return for checks totaling $23,500.

The earlier instrument under date of November 17, 1910, named by mistake, as party of the second part, Drexel & Co., a corporation. Drexel & Co. was in fact a partnership in which certain residents of Philadelphia and certain residents of New York City were partners. The second assignment was made in order to correct this mistake, and, while the moneys concerned were advanced by the partnership, the second assignment was caused to run to one of the partners (the plain-

tiff), in accordance with a custom by which individual partners took title to firm property and accounted for the same in the partnership books, for obvious reasons of convenience.

The plaintiff had as partner authorized the transaction in question, so, prior to the beginning of the action, he as an individual paid over to the firm of Drexel & Co. the amount involved, which thus became his individual asset, free from any duty to account or as trustee.

The assignment is upon its face an absolute conveyance of the amount mentioned, and was made by the defendant Louis D'Esterre as one of the heirs at law of his mother, who died November 5, 1906. Her father, Otto Huber, died August 31, 1889, leaving property real and personal to his seven children, with a life estate to his wife, who lived until August 28, 1914. A part of the estate of Otto Huber, deceased, had been paid to Mrs. D'Esterre or to her administrator prior to the making of the assignment in question; but a large amount of real and personal property is still in the hands of the executors of Otto Huber, deceased, and they have been made parties to this action.

[1] These executors have objected to the entry of any decree establishing the present claim of Louis D'Esterre or his assignees, in the estate of Otto Huber, deceased, prior to the accounting and recognition of those claims in the Surrogate's Court of this county. These executors have taken the position that this court has no jurisdiction to direct payment by them of any specified amount, or to determine the ultimate value of the share of Louis D'Esterre. Ingersoll v. Coram, 211 U. S. 335, 29 Sup. Ct. 92, 53 L. Ed. 208, disposes of the question involved and upholds the jurisdiction of this court to determine whether or not Louis D'Esterre or his assignees are possessed of a share in the estate of Otto Huber, deceased, and to determine the limitation or extent of such share. It is, however, not within the jurisdiction of this court to perform the functions of the Surrogate's Court, in passing upon the accounts of the executors, nor to direct the distribution of the estate of Otto Huber, deceased, independently of the decree of the Surrogate's Court in that regard. Waterman v. Canal-Louisiana Bank, 215 U. S. 33, 30 Sup. Ct. 10, 54 L. Ed. 80.

In Ingersoll v. Coram, supra, it was held that the United States court had jurisdiction, where diversity of citizenship existed, to determine the rights gained by an assignment of an interest under a will, as between the parties to the action. It was recognized in that case that the Circuit Court of the United States could not thereby supersede the probate court, or take away from the probate court jurisdiction to determine what property should come into the hands of those parties described as executors in the United States court action, or what interest should be subject, in their hands, to the rights which the United States court might decree. A decree of the probate court upon these matters would be res adjudicata. Comity would require the United States court to leave to the exclusive jurisdiction of the probate court the determination of the matters as to which it, solely, should render a decree. The rights of the executors, therefore, are fully protected, and the objections raised by them to the jurisdiction of the court have been overruled.

[2] Their position is made the basis, however, of a defense urged by Louis D'Esterre, under section 629 of the Revised Statutes, now embodied in section 24, par. 1, of the Judicial Code, which prohibits the United States court from taking cognizance of a suit upon a chose in action, in favor of any assignee, unless such suit might have been prosecuted to recover upon the chose in action if no assignment had been made.

It is contended that this prohibits the present action unless the defendant Louis D'Esterre could have sued in the United States court for this district to obtain payment of his share in the estate of Otto Huber, deceased. Louis D'Esterre is admittedly a resident of this district. The plaintiff is a resident of the Eastern district of Pennsylvania, but the other defendants are also residents of the state of New York. But as was held in Ingersoll v. Coram, supra, and in Brown v. Fletcher, 235 U. S. 589, 35 Sup. Ct. 154, 59 L. Ed. 374, an interest in a distributive share of an estate is not per se within the language of the section referred to.

The defendants claim that the case of Ingersoll v. Coram, just cited, had to do with the assignment of an aliquot or definite fractional share in the estate in question. They also urge that the case of Brown v. Fletcher, supra, expressly excepts determination as to the effect of assigning $35,000 out of a $50,000 share, "if it shall appear that the trust estate in the hands of the trustee consists of property and not of money." The Supreme Court, however, says that the words of section 24 of the Judicial Code can refer only to a cause of action based on contract. Kolze v. Hoadley, 200 U. S. 76, 26 Sup. Ct. 220, 50 L. Ed. 377; Shoecraft v. Bloxham, 124 U. S. 730, 8 Sup. Ct. 686, 31 L. Ed. 574. It is further stated, in Brown v. Fletcher, supra, 235 U. S. on p. 598, 35 Sup. Ct. 154, 59 L. Ed. 374, that the relation between trustee and cestui que trust is not contractual.

It is impossible to see how the assignment of $35,000 out of $50,000, or how the assignment of a share amounting to $50,000 out of a supposedly larger legacy, would be any less or any more the assignment of a chose in action than would the assignment of a one-fourth or one-fifth interest in that legacy. If the entire legacy establishes, not a contractual, but a beneficial claim (measured by legal rights between the executors and the beneficiaries), then the United States court would have jurisdiction over one as soon as over the other.

[3] It is urged by the defendants that the existence of citizens of New York as partners in the firm of Drexel & Co. is a bar to the maintenance of an action in the United States court, as the defendants contend that these partners are the real parties in interest, and that the plaintiff is not entitled to be recognized as a party litigant, resident in a state other than that of the defendants.

This brings us to the facts attending the making of the assignment, as they are presented by the testimony. On September 1, 1907, the defendant Louis D'Esterre married the defendant Anna Williams D'Esterre, who is still living. This defendant Louis D'Esterre was born and brought up in Brooklyn, attending the schools of that borough, and receiving no particular business education. Upon leaving high

school he went into business with his father and uncles at the Otto Huber Brewery for a few days, and then obtained employment in an electrical concern, where he earned $15 a week, which was the amount of his salary when he married. He thereafter engaged in the millinery business in Jersey City; but this business was unsuccessful, and the money which he put into it was lost. His living expenses for a time were contributed by his father, to such extent as he was able; but by the fall of 1910 he was in debt for household expenses and casual obligations which he had no immediate way of meeting. He had also, some six months previously, borrowed $5,000 upon a six months' note, to secure which he had made a mortgage of $5,000 on his share in the estate received by him from his mother as one of the heirs of Otto Huber, deceased. This estate was then subject to the life interest of Louis D'Esterre's grandmother, who was 70 years old and in good health. Louis D'Esterre had also made another assignment, to secure the sum of $1,000 and interest for borrowed money.

During the month of September, 1910, Louis D'Esterre consulted various commissioners or loan brokers, for the purpose of obtaining cash for his current needs and to meet the interest obligation upon the $5,000 note which was due October 29, 1910. This obligation was held by one Nahm, whose attorney at law, one Louis Wertheimer, died before the trial of this action. Wertheimer had demanded for his client payment of this interest, and in case of default threatened to foreclose the assignment to obtain the principal, which led Louis D'Esterre to seek a loan sufficient to pay these amounts, before the 29th day of October, 1910. In so doing he had some relations with an attorney named Mendel, who also died prior to the trial of the action, and to whom D'Esterre delivered an authorization to procure for him a loan in the sum of $14,500, to be secured by the interest of Louis D'Esterre in the Huber estate. From this Louis D'Esterre was to realize about $6,000. Mendel had, in some way not made clear by the testimony, invoked the good offices of one Herbert P. Queal, who had negotiated other transactions of this nature, and who took up with Drexel & Co. (a partnership composed of certain individuals in Philadelphia and certain other individuals who composed the New York firm of J. P. Morgan & Co.) the financing of the matter. This was done through an attorney, one Carrol R. Williams, and in consequence of his activities Mr. Queal, whose name had been in some way inserted in the authorization just mentioned (in the place of the name of Mendel), wrote Drexel & Co. upon October 28, 1910. This letter stated that Louis D'Esterre was entitled to upwards of $125,000, vested in him subject to the life estate of his grandmother, who was stated in this letter to have been 72 years of age on April 27, 1910. This letter offered to sell an interest amounting to $50,000, payable upon the death of the grandmother, for $28,000, and to furnish the papers and pay the fees of such counsel "as you shall select to pass on the legality of the transaction."

It appears that in the meantime some discussion had arisen with relation to the possibility of securing such a loan as D'Esterre had desired to seek through Mendel, and Wertheimer, the attorney for Nahm, had claimed the right to act for Louis D'Esterre, so as to protect the

interest of his client Nahm. The result of these negotiations was that upon November 1, 1910, Louis D'Esterre and Herbert P. Queal entered into an agreement by which Queal was authorized to sell -a $50,000 interest in D'Esterre's portion of the estate of Otto Huber, deceased. Queal was to take care of all expenses and charges and to receive for his fees and for such charges any sum which might be obtained by such sale over and above the sum of $20,000. The matter was to be closed on or before November 15, 1910, in the city of Philadelphia, and notification was to be given to D'Esterre, through his attorney Wertheimer, not later than November 12, 1910, at which time the papers were to be submitted, and, if the matter was not closed under these terms, the authority of Queal was to cease.

It also appears that, in the meantime, through the assistance of Queal, D'Esterre had borrowed $150 from an attorney named Wells, who subsequently acted as attorney at law for Louis D'Esterre in matters ·which will be referred to later. This $150 was secured by a note indorsed by Queal, and was used to pay the interest upon the Nahm assignment. By this arrangement an extension of time for the payment of the principal to Nahm was obtained until the 15th of November, 1910, and, subsequently, to the 22d of November, 1910, in view of the agreement which had then been entered into to secure the money from Drexel & Co.

It also appears that on or about October 24, 1910, D'Esterre had agreed that Mendel should obtain for him a loan of $50,000, from which he should realize the sum of $18,250, and that Mendel subsequently sued D'Esterre upon the basis of this agreement; but the disposition of that litigation was entirely outside of the matters with which we are concerned in this action.

The communication of Queal to Drexel & Co. was followed by an interview between Queal and one Horatio G. Lloyd, a member of the firm of Drexel & Co., in Philadelphia. Mr. Lloyd did not at first think well of the proposition; but subsequently, after consultation with the plaintiff, Mr. Edward T. Stotesbury, a member of that firm, suggested that they might be willing to pay $22,000 for the assignment of the $50,000 interest in D'Esterre's portion of the Huber estate. Upon examination of the will of Otto Huber and a schedule of what was represented to be the assets of the Huber estate, an agreement was finally reached that Drexel & Co. would give the sum of $23,500; it having appeared in the meantime that Mrs. Huber (the grandmother) was 70 years old instead of 72. The matter was referred to Philadelphia counsel of Drexel & Co., H. Gordon McCouch, who was to pass upon the so-called "legalities" of the transaction. The assignments were to be submitted when drawn, and searches were to be made by the New York legal representatives of Drexel & Co., and Mr. Egerton L. Winthrop, Jr., of the firm of lawyers now representing the plaintiff in this action, was named as the attorney to do this work.

By November 18, 1910, the assignments had been prepared and the searches made showing the prior assignments to Nahm and to Reed, which the counsel for Drexel & Co. required should be taken up so as to leave the assignment for $50,000 as a first lien against D'Esterre's interest in his grandfather's estate.

The assignments to Drexel & Co. were executed in New York upon the 17th day of November, 1910, by Louis D'Esterre and wife, and acknowledged before notaries public in New York and Brooklyn. These assignments were submitted to McCouch by Queal, in Philadelphia, and a receipt given by which Drexel & Co. agreed to return the assignment if the transaction was not consummated. They were then given to Queal to record in Brooklyn, which was done on or about the 21st day of November, 1910, one each in the three offices where record was required. Upon notification of this recording, checks for the payment of the Reed and Nahm assignments were given to Queal, dated November 22, 1910, and, with these checks, assignments of the Reed and Nahm claims to Louis D'Esterre were obtained and recorded.

The testimony shows that these reassignments were made in order that Drexel & Co. might be subrogated for the amount of their advances, if the $50,000 assignment was not carried through. After these reassignments to Louis D'Esterre had been recorded, a letter from Winthrop, under date of November 22, 1910, was sent to McCouch informing him that the $50,000 assignment had been properly executed and recorded, so as to convey a valid title to the extent of $50,000 in the estates of Otto Huber and Lina D'Esterre, deceased; that reassignments of the Nahm and Reed claims had been properly recorded; and, also, that upon November 18, 1910, Winthrop had explained the matter to D'Esterre, who represented that he was not hard pressed, but intended to use the money to establish himself in the millinery business, and fully understood the effect of the assignment, which was satisfactory to himself and his wife.

On November 23, 1910, Louis D'Esterre, with Queal, went to the office of McCouch, in Philadelphia, where he signed the following paper, upon which was also written the following receipt:

"I, Louis D'Esterre of the borough of Brooklyn, city of New York, state of New York hereby direct Drexel & Company to disburse the sum of twenty-three thousand five hundred ($23,500) dollars, consideration for my sale to said Drexel & Company of fifty thousand ($50,000) dollars of all my right, title and interest in and to the estates of Otto Huber, Senior, my deceased grandfather and Lina D'Esterre my deceased mother to Drexel & Company, as follows:

| | |
|---|---|
| Pay to the order of Arthur L. Reed......................................... | $ 1,020 00 |
| Pay to the order of Julius Nahm......................................... | 5,312 50 |
| Pay to the order of Frank M. Wells......................................... | 150 00 |
| Pay to the order of Louis D'Esterre......................................... | 13,517 50 |
| Pay to the order of Herbert P. Queal for his commissions, counsel fees and disbursements......................................... | 3,500 00 |
| Total ......................................... | 23,500 00 |

"Dated New York, November 19, 1910.             Louis D'Esterre.
"Witness: Herbert P. Queal.
"I acknowledge receipt of above checks aggregating $23,500.
"Philadelphia, Pa., Nov. 23, 1910.             Herbert P. Queal."

At this time the three checks to the order of Wells, D'Esterre, and Queal were made out and delivered. A short time after the recorded assignments came into the hands of McCouch, who noticed that they had been executed to Drexel & Co., a corporation.

It was apparent that, upon proper showing, Drexel & Co. could compel reformation of these instruments, inasmuch as the description of the party paying the consideration was incorrect, in that Drexel & Co. was not a partnership and that no such corporation as Drexel & Co. existed. Negotiations were immediately started which resulted in the making of a new assignment, in triplicate, upon the 30th day of November, 1910, by Louis D'Esterre and his wife, in consideration of one dollar and other good and valuable consideration, but running to Edward T. Stotesbury, a member of the firm of Drexel & Co., and being for the purpose of ratifying and confirming the assignment previously made upon November 17, 1910. The instrument recited the incorrect description in the earlier assignment and the request of Drexel & Co. to make the new deed run to Edward T. Stotesbury, a member of said firm. This was done at the suggestion of McCouch, who testifies that it was customary, in order to avoid difficulty in the execution of papers where so many individuals were concerned, to have title placed in one member of the firm who would, in the course of the partnership business, account for the result of the transaction to his partners. This new confirmatory deed was recorded, and provided, as did the earlier instrument, for the payment of interest upon the sum of $50,000 after the death of the life tenant, and until the amount of the assigned interest should be paid over to the assignee.

Mrs. Huber, Sr., died, as has been stated, upon August 28, 1914; that is, within a little less than four years after the execution of the assignment. According to the testimony, the expectancy of the life tenant upon November 17, 1910, was 9.18 years, according to the Carlisle tables, and 8.5 years, according to the American mortuary tables. It also appears that the present value of $50,000, based upon the life of a woman 70 years old, computed according to the Carlisle tables, would be $32,241.40, and according to the American tables, $872 more.

After the death of Mrs. Huber, Sr., the defendant Louis D'Esterre, through Wells, who then acted as his attorney, communicated with Stotesbury, offering to pay the amount advanced with interest and asking for a reassignment upon such payment. This letter states that upon July 1, 1912, Louis D'Esterre executed an additional assignment in the sum of $70,000, as security for a loan from the Logan Trust Company of Philadelphia, and that he had guaranteed to his brother that his (Louis') remaining interest in the estate was at least $40,000. This letter also states that, according to the executors' accounting, Louis D'Esterre's share was $^2$/$_{63}$ parts of such estate, and that its value appeared to be about $80,000 instead of $160,000, as represented by said Louis D'Esterre in the assignment to Drexel & Co.

It appears from the testimony that, both in the assignment to the Logan Trust Company and in a further assignment to the Huguenot Trust Company, Louis D'Esterre stated that he had disposed of a $50,000 share in the Huber estate to Drexel & Co., and it also appears from the instruments of assignment to Drexel & Co. that the statement by Louis D'Esterre was to the effect that his share in the estate was $170,000, instead of $160,000, as recited in Mr. Wells' letter. It also appears that upon June 5, 1912, Louis D'Esterre had written Drexel &

Co. recalling to their attention that in November, 1910, he had disposed of a $50,000 portion of his interest in the estate of Otto Huber, of Brooklyn, N. Y., and that he desired to dispose of an additional $100,-000 portion thereof. This letter D'Esterre testifies he had no idea would be favorably received. It was written upon the letter head of the H. H. Dean Co., bearing the words "Louis D'Esterre, Secretary and Treasurer." D'Esterre testifies that he offered to go into business with Dean, and that the letter heads were printed solely at the request of Dean, but that he never took office in such company, never put any money therein, and that it was done merely as a favor to Dean. Drexel & Co. promptly refused the offer of a further assignment, and also replied to the letter of Wells, in which Stotesbury, while admitting that his purchase had proved to be profitable through the death of the life tenant, had instructed McCouch, who wrote the answer, to advise Wells that he knew of "no reason why he should sell the same at any discount whatsoever."

The next step in the transaction was the bringing of the present action, in which Stotesbury filed a bill in equity alleging that he had no adequate remedy at law, and sought to avoid multiplicity of suits, relief to the effect that he should be declared entitled to immediate possession of $50,000 with interest from August 28, 1914, out of the interest of Louis D'Esterre in the estate of Otto Huber, deceased, and the estate of Lina D'Esterre, deceased; that Joseph Huber, as executor and trustee, should be required to pay to the plaintiff the sum of $50,-000 with interest as aforesaid; that William H. D'Esterre, as administrator of the estate of Lina D'Esterre, should be directed to pay the sum of $50,000 with interest as aforesaid, in case it should be determined that the executor of Otto Huber should pay the share of Lina D'Esterre in her father's estate to her administrator; and that the parties should be enjoined from litigating in any other court the transfers above recited.

The defendant Joseph Huber, as executor, trustee, etc., takes no part in the controversy between the plaintiff and Louis D'Esterre, but has upon the trial insisted upon his objection to any exercise by this court of jurisdiction over the matters actually pending in the Surrogate's Court, viz., the administration of the estate under probate proceedings.

As has been stated, this court will confine its decree to a determination of the claims which may be enforced through Louis D'Esterre, when a final distribution or accounting may be had in the courts of the state of New York.

The defendant William H. D'Esterre, in the same way, while avoiding any participation in the controversy between the plaintiff and Louis D'Esterre, objects to the exercise of jurisdiction by this court in passing upon the rights of said D'Esterre, in and to the estate of Otto Huber, deceased, and merely presents to the court a statement, subject to said objection, of such distribution as has already been made in the estate of Lina D'Esterre, deceased.

The defendants Louis D'Esterre, and Anna Williams D'Esterre, his wife, answered charging fraud, duress, and usury, as well as failure

of jurisdiction through misjoinder of parties. The answer as amended avoids any charge of fraud, but repeats the defense of usury, unconscionable contract, and misjoinder of parties. On the trial the objection to jurisdiction, because of the alleged transfer of a chose in action, was presented, and the defendants also offered to repay the sum of $23,500 with interest, if the court so decreed.

Upon the trial Louis D'Esterre testified that his understanding had been that the amount of such loan was but $20,000, and disavowed knowledge of the $3,500 paid to Queal to cover his fees and expenses; but, on being confronted with the documents in question, D'Esterre admitted that the actual amount involved, and for which he would be liable in the event that the claim should be held valid as a loan, was the said sum of $23,500.

The issue which must be first considered is that of the jurisdiction of this court, based upon the citizenship of the parties. The plaintiff is a resident of the state of Pennsylvania, but it is claimed that the real parties plaintiff are the members of the firm of Drexel & Co., and that Mr. Stotesbury, even though he has paid back the money to the firm, has not thereby obtained title either for himself or as trustee for his partners.

The basis for this contention is that the making of the first assignment to Drexel & Co., a corporation, was not superseded by the making of the second assignment to Mr. Stotesbury as an individual. It is not questioned that by "Drexel & Co., a corporation," was intended the firm of Drexel & Co., a partnership; nor is it suggested that any corporation of that name has acquired an interest in the subject-matter of the assignment. But the defendants urge that, inasmuch as by the mistaken title it was intended to transfer to certain individuals a share in the estate of Otto Huber, deceased, and inasmuch as the identity of those individuals is admitted, the mistake of calling Drexel & Co. a "corporation" can be overlooked. They consider that the effect of both assignments was to transfer to Drexel & Co., as a copartnership, certain rights which have never been given up by the partners. The legal instrument entered into by Louis D'Esterre for the sake of correcting the mistake is said by the defendants to be a conveyance to Mr. Stotesbury as a "dummy," and that he cannot without a properly executed assignment get actual title. Of course, an actual assignment would be assailed by the objection under section 24 of the Judicial Code. This would, however, be of no effect if, as held in Brown v. Fletcher, supra, the interest of Louis D'Esterre was not a chose in action. But, further, the first assignment was a nullity except by subrogation, and Drexel & Co. could transfer any rights they had to Stotesbury or any other person who could take title to the property, and who would be accountable to them only by means of an outside agreement with which we are not concerned. If Louis D'Esterre did not contest the right of Drexel & Co. to create through him a voluntary and possibly unenforceable trusteeship, then he cannot now repudiate the effect of his own transfers by suggesting that Drexel & Co., as a firm, might have been defrauded by Mr. Stotesbury. The firm received back its money.

The difficult questions in this case are based upon the proposition left open for determination in Brown v. Fletcher, supra, when the court leaves the issue for the lower court as to the effect of an assignment of a certain amount in dollars from a vested remainder, in real estate or even in personalty. This brings under consideration certain decisions of the New York courts as to the assignment of a sum of money in payment of what was intended to be a loan, and also brings into consideration the acts and purposes of the defendant Louis D'Esterre in making the assignments in question.

From this two questions are presented:

[4] I. Is an assignment of a definite amount of money out of an undivided share in an estate, comprised of real and personal property, valid as an enforceable transfer? The right of sale or the existence of a so-called equitable conversion must be taken into account in determining this point. In the will of Otto Huber, a power of sale was granted. Whether there was an equitable conversion of his real estate into personalty, for the payment of the legacies in question, or whether the action of the executors in turning the estate into cash for the payment of the bequests makes an answer unnecessary, an assignment could certainly be valid if the interest of Louis D'Esterre exceeded the amount of $50,000 and interest. The transfer of a $50,000 interest in real estate conveys a title which could be made the basis of a partition suit if the executors do not reduce the estate to cash, or if the estate is partially reduced to cash and the balance is left undivided in real estate.

[5] II. Under the laws of New York, will any assignment of an interest measured by a liquidated amount of money be considered as payment for a loan, if the transfer be in consideration of the advancement of cash to meet the requirements of one who is in straightened circumstances?

Before discussing these New York cases, it must be determined whether the law of New York or of Pennsylvania governs the transaction in question.

It is apparent that the plaintiff seeks to establish the instrument in question as a deed or bill of sale of actual properties, title to which was vested in Louis D'Esterre subject to the life estate of his grandmother and the statutory rights of his father. In this sense the part of the estate then consisting of real estate (even if the executors had power of sale) could be conveyed only by a deed sufficient under the law of New York. The personal property was in the jurisdiction of the Surrogate's Court in Kings county and subject only to a transfer which was valid in that court.

In order to support the contention that the contract was made in Philadelphia, that delivery was had there, and that the validity of the same should be tested by Pennsylvania law, the plaintiff seeks to separate the assignment from the transfer of the land in completion of the transaction. But, if so, he could not bring himself within Brown v. Fletcher, supra. A contract to convey is not a conveyance, nor is it the transfer of a share in a specific res.

The elementary proposition that a contract is governed by the law

of the place where the contract is made is urged by the plaintiff in asking that the laws of Pennsylvania be held to cover the assignment by D'Esterre. The plaintiff cites in support of his contention such cases as Scudder v. Union National Bank, 91 U. S. 406, 23 L. Ed. 245, where the contract related to a chose in action, or Equitable Life Society v. Clements, 140 U. S. 226, 11 Sup. Ct. 822, 35 L. Ed. 497, Manhattan Life Insurance Co. v. Johnson, 188 N. Y. 109, 80 N. E. 658, 9 L. R. A. (N. S.) 1142, 11 Ann. Cas. 223, and Staples v. Nott, 128 N. Y. 403, 28 N. E. 515, 26 Am. St. Rep. 480, in which the contract was valid in the place where made, but security was furnished which was located in a jurisdiction where the contract would be invalid. So, also, Miller v. Tiffany, 68 U. S. (1 Wall.) 298, 17 L. Ed. 540, which is based upon a citation from Andrews v. Pond, 38 U. S. (13 Pet.) 65, 10 L. Ed. 61, as follows:

"The general principle in relation to contracts made in one place, to be executed in another, is well settled. They are to be governed by the law of the place of performance, and, if the interest allowed by the laws of the place of performance is higher than that permitted at the place of the contract, the parties may stipulate for the higher interest, without incurring the penalties of usury."

The defendant cites Green v. Van Buskirk, 74 U. S. (7 Wall.) 139, 19 L. Ed. 109; Loftus v. Farmers' & Mech. National Bank, 133 Pa. 97, 19 Atl. 347, 7 L. R. A. 313; Pullman's Palace Car Company v. Pennsylvania, 141 U. S. 18, 11 Sup. Ct. 876, 35 L. Ed. 613; Schmidt v. Perkins, 74 N. J. Law, 785, 67 Atl. 77, 11 L. R. A. (N. S.) 1007, 122 Am. St. Rep. 417—to the effect that the place of domicile governs certain contracts having to do with the activities of an individual, but that this may be overruled by the laws controlling the property in its actual location. He also cites Genet v. Hudson Canal Co., 13 Misc. Rep. 409, 35 N. Y. Supp. 147, U. S. v. Fox, 94 U. S. 315, 24 L. Ed. 192, McGoon v. Scales, 76 U. S. (9 Wall.) 23, 19 L. Ed. 545, and Boyce v. City of St. Louis, 29 Barb. (N. Y.) 650, to the effect that contracts relating to land, or directly affecting property located within the direct control of courts in a certain jurisdiction, will be construed according to the laws of that jurisdiction. The defendant infers therefrom that contracts, relating to the undivided property of an estate, have in necessary contemplation the statutory limitations or obligations placed upon the property (real and personal) of the estate, as distinguished from the mere personal rights of the parties entering into the contract.

On this question the defendant points out that the executors of Otto Huber were given power of sale but were not directed to sell his estate, and that at the death of the life tenant some of the real estate had not in fact been sold, but that the interest of the various devisees has attached to the real estate itself. They urge that this was within the contemplation of any person contracting as to the estate, and that therefore the laws relating to the assignment of rights in real estate in Kings county would control any transfer of rights in that real estate. They also point out that the instruments in question were actually executed and turned over to an attorney for record in New York. They

contend that the delivery in Philadelphia was but a step in the making of the contract, which would not of itself cause the contract to be judged by Pennsylvania standards of law.

If some penal enactment or statutory regulation as to entering into this contract, or agreeing to the terms of this contract, were prohibited by the laws of Pennsylvania, it could not be contended that the contract with which we have to deal would not be subject thereto. On the other hand, such laws as recording acts or statutes as to the effect of the assignments in question would certainly be governed by the laws of New York, where the contracts were to be carried out and where title to the subject-matter of the contracts was within control of the New York courts and would have to be perfected.

A statute of limitations or a statute of frauds affecting the transfer under the laws of New York would be applicable to a transaction of this sort, even though a contract to transfer, valid under the laws of the state of Pennsylvania, might have been made by which, in that state, or in the United States courts, the parties could be compelled to carry out their contract so as to give good title in the state of New York.

In the present case, the contract itself was entered into in Pennsylvania. Under the laws of Pennsylvania, as shown by the decisions of the courts (In re Phillips, 205 Pa. 511, 55 Atl. 212), a complete transfer of tangible or intangible property is valid if the parties entering into the transfer actually intended to sell a property interest, as opposed to transferring property to pay back borrowed money with more than the legal rate for the loan. The usury statute of the state of Pennsylvania provides that the amount of the loan with legal interest shall limit recovery and does not make the entire transaction void from inception; but the Pennsylvania law also seems to recognize a distinction between a completed transfer, with the time of payment conditional (which is a valid sale), and a promise to pay back an amount more than sufficient to cover any possible accumulation of interest and principal (which is usurious in any jurisdiction).

We have therefore a transaction which could be validly undertaken in Pennsylvania only if the contract was not to secure a loan. But to find that the transfer of this property was merely an usurious loan is to go much further. It is to conclude that the rules of law known to the plaintiff and expressly called to the defendant's attention, the deliberate purpose of both parties in so entering into an agreement as to make it legal instead of illegal, and the careful action of those concerned so as to make it plain that they understood what would be illegal and were avoiding an illegal contract, were but subterfuges and evasions.

When we come to the law of the state of New York, we have, however, an additional suggestion from some recent cases in the Appellate Division of the Supreme Court of the State of New York, First Department, one of which, Hall v. Eagle Insurance Co., 151 App. Div. 815, 136 N. Y. Supp. 774, affirmed 211 N. Y. 507, 105 N. E. 1085, discusses the proposition at length.

As was said in Brown v. Fletcher, supra, an actual determination of the merits as to an assignment of a $35,000 interest from a $50,000 estate is not settled by a holding that the court had jurisdiction to pass upon the question, and the New York cases present a different issue than that based only upon In re Phillips, supra.

In Hall v. Eagle Ins. Co., 151 App. Div. 815, 136 N. Y. Supp. 774, the Appellate Division of the Supreme Court has in effect held that the usury statute of New York, which reads as follows:

"Sec. 370. The rate of interest * * * shall be six dollars upon one hundred dollars, for one year. * * *

"Sec. 371. No person * * * shall, directly or indirectly, take or receive in money, goods or things in action, or in any other way, any greater sum or greater value, for the loan or forbearance of any money, goods or things in action, than is above prescribed."

"Sec. 373. All * * * conveyances * * * whereupon or whereby there shall be reserved or taken * * * any greater sum * * * for the loan or forbearance of any money * * * than is above prescribed, shall be void." Consolidated Laws 1909, c. 20.

—is the equivalent of an enactment by the Legislature that any assignment of an interest in property exceeding in value the principal and interest for the estimated life of a life tenant, upon the amount given as consideration, shall be deemed usurious and to be no more than a contract of loan with security therefor, even though presented in the form of an actual sale for a fixed consideration.

The Hall Case holds that the transfer of a fractional share or an uncertain interest in a property or devise would be valid. This seems to be stated as correct, whether applied to personalty or realty. But when the uncertain element is merely the length of postponement of payment, and when the future establishes the time of payment as within the period in which legal interest would equal the amount assigned, then the laws of New York are to the effect that an assignment to reimburse the lender must necessarily be construed as an usurious loan. In the Hall Case the court, however, held that an offer to repay the loan might be recognized and the transaction treated as void in part only. But in Hartley v. Eagle Insurance Co., 167 App. Div. 230, 152 N. Y. Supp. 686, the court said that where the only issue was the validity of the transaction, and where no such tender had been made, the entire agreement must fall.

The present case is distinguished from the Hall Case, in that no mortgage was given to secure the assignment or to repay the loan. D'Esterre evidently was seeking a loan, but he was told plainly that such a loan could not be made. If he had applied to an institution in the business of discounting future properties for their present value according to the insurance tables, the commercial value of what he was obtaining would have as a minimum the price reached by computing interest for the probable life of the life tenant, according to some recognized table. This might have been the basis of a loan, but evidently no institution was willing to make a loan upon the estate of Otto Huber of such a nature. It was necessary to find an individual who would gamble, on the one side, as against D'Esterre, who was gambling upon

the other side, when the matter was viewed from the standpoint of the single transaction. It is evident that the person advancing the money would advance as little as possible in order to make his chance of loss upon the gamble as little as possible.

It may be policy to protect individuals by prohibiting all such transactions, but they do not all involve usury. It is not gambling in the criminal sense, and it is difficult to see how the New York courts would view a contract of this sort, or consider it usurious, if the date of fulfillment of the condition had run beyond the time when the principal and interest equaled the amount of the assignment. If the transaction is void from its nature, then it is difficult to see why it should be recognized as valid, even if the amount of principal and interest should far exceed the figures of the assignment.

But, as has been said, the transaction of the deed with which we have to deal is not in all respects like that in the Hall Case. The instruments in the record, as well as the subsequent instruments executed by Louis D'Esterre, show his intent to treat the transaction as a sale, but yet a sale which was in effect a mortgage with illegal interest. He needed protection as all improvident persons, who are not capable of earning as much as they spend, need control in their transactions. Therefore, while it does not seem possible to find that in this particular instance the parties were intentionally making an usurious loan (even though the brokers originally endeavored to obtain a loan before they found that this was impossible), yet the defendant Louis D'Esterre may be entitled to some equitable relief as actually granted by the New York court in the Hall Case.

This involves the question which has been reserved, as to the possibility of assigning a $50,000 share in an estate involving real estate or undistributed and unliquidated securities. The very provisions of the law relating to partitions and the protection of persons holding valid liens for liquidated amounts lead us to the conclusion that there is no inherent difficulty, legal or otherwise, in selling an interest in real property, even comprising a decedent's estate, which interest should be measured by the amount involved instead of by a fractional interest based upon arithmetic or survivorship between the members of the family.

But whether the transfer was a fair sale of such an interest depends upon the facts, and also upon the knowledge of the parties. It is urged that Queal was the agent for D'Esterre, even though Drexel & Co. intrusted the recording of certain papers and the performance of some steps in the transaction to him. The defendant seeks to throw responsibility for knowledge of D'Esterre's condition upon Drexel & Co. by charging that Queal was Drexel's agent, knew D'Esterre's real position, including his desire to secure a loan, and that Queal was Drexel & Co.'s agent in determining how to evade the usury statute.

While Queal was apparently not acting for Drexel & Co., and while his services as their agent in certain ministerial acts would not make them responsible for matters known only to him, it is nevertheless true, as claimed by the defendant, that Queal had information of D'Esterre's desire to obtain a loan and to give a $50,000 share in the estate as

security. It was Queal who informed D'Esterre that such a contract would not be considered. This was in the fall of 1910, and the case of Mercantile Trust Co. v. Gimbernat, 134 App. Div. 410, 119 N. Y. Supp. 103, had been decided in November, 1909, to the effect that an assignment of a share in a remainder over a limited estate was nothing but a cover for an usurious loan, when the time of payment of the remainder was definite and the amount of the assignment covered more than interest upon the sum advanced, with various items for expenses which were not proven to the satisfaction of the court. Further, the case of Wetzlar v. Wood (reversed in 143 App. Div. 311, 128 N. Y. Supp. 501) had been decided at Special Term to the extent of upholding a purchase of an interest in an estate. The basis of the decision at Special Term was certain evidence in the form of affidavits by which the assignor was held to have been estopped from showing that the transaction was not one of legitimate sale. These decisions were known to all of the parties, inasmuch as the attorneys for Drexel & Co. used them as the basis of their opinion in considering whether the laws of New York or of Pennsylvania would apply to the transaction, and whether even under the laws of New York the transaction would be invalid.

It is urged by the plaintiff in the present action that any one relying honestly upon the propositions of law upheld by the courts of the state at a given time could not be held to have acted in any fraudulent or inequitable manner if subsequently thereto the rules of law were changed by judicial decision. Gelpoke v. City of Dubuque, 68 U. S. (1 Wall.) 175, 17 L. Ed. 520; Muhlker v. N. Y. & Harlem R. R., 197 U. S. 544, 25 Sup. Ct. 522, 49 L. Ed. 872; Harris v. Jex, 55 N. Y. 421, 14 Am. Rep. 285; and others. While this proposition is true, it does not apply in the present case, for the subsequent decisions of the courts of New York have not constituted a reversal or change from what had been the law previously, but are merely determinations or definitions of what under the laws of New York constituted inequitable (that is, unconscionable) contracts. If such a contract should be held inequitable or unconscionable, it possessed the same qualities and the decision should have been the same prior to the announcement of the law, and an honest opinion that the courts would hold to the contrary, or even an honest opinion that the previous decisions of the court were to the contrary, would not mean that the law had been changed.

The principles of equity are the same, and no decision has been cited showing an actual finding that such a contract was not unconscionable or inequitable. In the Gimbernat Case, as in Hall v. Eagle Ins. Co., 151 App. Div. 815, 136 N. Y. Supp. 774, and Otten v. Freund, 150 App. Div. 434, 135 N. Y. Supp. 59, the court found the transaction to be in fact a loan, and hence that the assignment was an evasion of the usury statute, for the reason that security of some sort accompanied the assignment and because the amount of the payment exceeded the loan and legal interest.

In the cases of Leavitt v. Enos, 155 App. Div. 584, 140 N. Y. Supp. 862, and Hartley v. Eagle Ins. Co., supra, an assignment of a definite sum, of which the payment might be delayed, was held void for usury,

because the amount as advanced was much less than the face of the assignment. So, also, in Wetzlar v. Wood, supra, although security accompanied the assignment, this security was only to protect against a contingency which might render the assignment ineffectual prior to the date of payment. In effect, the decision in Wetzlar v. Wood, supra, was based upon the inherent nature of the transaction, and not upon the fact that security for a so-called loan was given as well as the assignment of an estate payable in the future.

The court in Hall v. Eagle Ins. Co., supra, discussed at length what constitutes evasion of the usury law, and states that it is the law in England, as well as the United States, that any agreement to return the principal in any event, and to agree to give a profit beyond the legal rate of interest because of the necessity or improvidence of the borrower, makes the contract usurious. The authority for this is Colton v. Dunham, 2 Paige (N. Y.) 267, and cases cited therein.

It is evident that the principle stated is the law in substantially all jurisdictions, and it is also evident that the cases decided by the Appellate Division of New York, with the exception of Leavitt v. Enos and Hartley v. Eagle Ins. Co., supra, fall within this rule because the facts showed, in each case, that a loan was intended and that the amount to be paid was beyond any possible expenditure with interest added. In Leavitt v. Enos, it would appear that the court was satisfied as a matter of fact that payment would be made before the interest should cause the advance to mount up to the face of the assignment, and no different principle is presented.

We have not, therefore, doubt as to what was or is the law of New York, but a flat issue as to what was the transaction between Drexel & Co. and Louis D'Esterre in the present case.

D'Esterre was perfectly willing to make an usurious and invalid loan and to cover his acts up so that the invalidity could not be urged by him in the future. In other words, he was in a position where the New York law would protect him even against his own intent and consent. He readily acquiesced when told that he could not borrow money but would have to sell a share in his expectations. He also readily acquiesced when he perceived the necessity of answering the inquiries by Mr. Winthrop so as to deceive Drexel & Co. and their representative and to make out that he was not in financial straits, and was therefore mentally capable of entering into a contract of straight bargain and sale.

There is nothing in the evidence to indicate that Drexel & Co., or that Winthrop, who acted for them, intended to effect an assignment which should really cover up an usurious loan. On the contrary, they were unwilling to enter into that transaction, and there is no reason to impugn their motives. If the transaction was void or voidable because of usury or lack of equity, nevertheless this is a result purely from a determination of law, and not from any deceit or lack of good faith on the part of Drexel & Co. But yet if the transaction of itself is one which shows the advance to have been a loan, and if the only legal contract which could be based thereon would be an assignment in the form of a mortgage to secure the repayment of the loan with legal .

interest, then any assignment which should provide for the repayment of more than legal interest must fall in one of the two categories. It is either void as usurious, or inequitable (i. e., invalid) as an attempt to enter into a contract which a court of equity could not enforce.

In the present case the form of the contract was drawn in the course of transactions in which Louis Wertheimer acted as attorney for D'Esterre. This attorney also acted for the lender in the case of Otten v. Freund, supra, which was based upon what purported to be the purchase of a legacy and which had not been declared illegal at the time the Drexel transaction was completed.

It is evident that Mr. Stotesbury treated the matter like the purchase or sale of merchandise. Assuming that such a contract or purchase could be made legally, he was interested only in securing it at as cheap a price as possible, knowing that there was a physical possibility that payment would be deferred until he should lose money, if interest were added to the amount advanced. So in the purchase of merchandise, the value of the property might diminish and a loss result. Mr. Stotesbury did not approach this transaction from the standpoint from which an insurance company would figure the present value of the amount assigned; but taking that present value as the basis of what would make the maximum of the loan, and assuming that his attorneys' advice was correct and that the transaction was legal, he bid a smaller amount upon the chance of a profit and ran the risk of a chance of loss. There would be no usury nor usurious intent in that sort of a bargain; but, nevertheless, if Mr. Stotesbury had accepted, upon his attorney's advice, an assignment secured by mortgage of the property in the Huber estate, he would have entered into an agreement the legal effect of which would be to convict him under New York law of making an usurious contract.

So in the present instance, apparently with the best of intentions on the part of Mr. Stotesbury, with the most honorable and careful investigation and action on the part of his attorneys both in Philadelphia and in New York, and with the evident purpose on the part of D'Esterre and Queal to reach a bargain by which D'Esterre should transfer an interest in his grandfather's estate for that sum of money which he was willing to accept, and with evident appreciation on the part of D'Esterre that this could not be done legally in any form except that of a direct bargain and sale, the parties all joined in the making of an agreement which it was thought would avoid the objections made by the Appellate Division to other transactions, which had been held to be either usurious or inequitable, and yet which all the parties concerned ought to have understood involved one of the very difficulties or impossibilities which they thought they were avoiding.

The assignment provides for the payment of interest after the death of the life tenant. Although the transfer is supposed to be absolute, although no benefit and no use of the money would run to D'Esterre after title became absolute and the money was payable, nevertheless D'Esterre agreed to pay interest on the amount of the assignment in case any difficulties or delay in payment should result.

It may be assumed that this would insure D'Esterre's aid in a prompt delivery to Stotesbury; but nevertheless it shows that the price upon

which the bargain and sale was intended to be based was that outside price at which all of the parties thought loss to Stotesbury was impossible, and upon which Stotesbury and D'Esterre were willing to dicker from the standpoint of a commercial sale.

If therefore we go back to the original proposition, as held in Brown v. Fletcher, supra, that the assignment must be an absolute transfer of something that can be delivered or transferred, and if the value of this transfer is fixed by its commercial availability, then the present value of a certain share in or claim to the real estate and personal property, which could not be delivered for a certain length of time (during which according to the probabilities of life interest would run), was the maximum from which standpoint the speculation in value began.

As has been held by the Appellate Division, a contract starting out with the maximum amount which could be considered as security for a loan, and with a bargain as to the possibilities of increase or diminution in the value of the property transferred, when coupled with an agreement to pay interest if delay should result in the actual transfer when such transfer could be demanded and under circumstances where the parties are plainly seeking to avoid an agreement which upon its face would be usurious, must be held to be legally an evasion of the usury statute. Whether it is equivalent to an usurious transaction may or may not follow.

The alternative, applied by the Appellate Division in certain cases, of holding that equity need not necessarily find a transaction to be usurious and therefore void, solely because an intent to evade the usury statute was present (as in cases where the court rendered a decision that, upon readiness to repay the sum with interest, equity could direct such a result), would seem to be proper in a case like the present, where the intent of the parties was to obey the law but the effect of the bargain was to disobey the provisions of the statute, and where it would be unconscionable and inequitable to allow either side to profit beyond what would have been strictly legal if there had been no basis for the interposition of a court of equity. There certainly would be no basis for compelling the parties to accept a contract based upon an agreement to loan money for the expected term of the life tenant, that is to go into the insurance business and to make an individual contract upon the basis of the general course of business. The actual vesting of title under the assignment of this case happened, in so far as it could vest, within four years of the execution of the paper. The expected term of life on which the present value would be estimated was in the neighborhood of nine years. As a matter of fact, the transaction has already stood for nearly six years, and it may not be possible to obtain payment of any moneys at the hands of the executors for some time in the future. The result of such action may be to diminish the total amount which D'Esterre may ultimately receive, or possibly to affect only the balance payable to him and claimed by other assignees or creditors. But with that we have nothing to do. The action of a court of equity on the present facts should be to hold that the assignment was unconscionable in exceeding a fair sum to cover the amount paid, with interest and proper allowance for profit and expenses, now increased by the necessity of bringing suit.

When viewed from the evident good faith of the plaintiff in assuming that he was standing on equitable as well as legal rights, this situation, requires the court to enter a decree dismissing the bill as based upon an unconscionable and inequitable contract, upon the condition and in case the defendant Louis D'Esterre pays to the plaintiff the amount advanced by him, with legal interest to the date of payment, and with such profit as may be directed by the court, and with such allowance in lieu of costs as may be fixed by the court.