Cooke, J.
As early as 1962, Northville Industries Corporation, then known as Northville Dock Corporation, had expressed its interest in acquiring a right of way along the trackage of the Long Island Rail Road Company for the installation of a pipeline for the transportation of fuel oil, and possibly gas, in connection with Northville’s storage, terminal and docking facility at Riverhead, Long Island. This proposal was further refined, and, on different occasions, apparently to assure the railroad of its intention to enter upon the project, Northville stressed its desire for "the prompt establishment of an operating pipeline” and, sought the co-operation of the railroad "in speeding the pipeline construction process”. After numerous meetings, the parties entered into a written agreement, dated as of September 1, 1965, under which the railroad granted Northville "the right and privilege to erect, construct, install, use, operate, maintain, repair, renew and remove a pipeline, together with its appurtenances above or below and along and within the limits of the Railroad’s normal right of way * * * along the Railroad’s Main Line from Riverhead, New York, to a point distant not more than three miles west of Brentwood, New York.”
A provision in the agreement characterized it as a license agreement, and not a lease, in explanation of the fact that there would be no reduction in compensation payable by Northville to the railroad by reason of inconvenience, annoyance or loss of business arising from the railroad’s operations or repairs to and physical changes to its properties. Nevertheless, although many of the provisions recognized the paramount rights of the railroad in the maintenance and operation of its business and the subsidiary nature of the rights granted to Northville, the writing did provide, in general terms, that the railroad would not "impair, prejudice, or derogate from the rights granted herein * * * by any sale, lease, surrender, or other disposal” without the written consent of Northville.
*458 Under the agreement, as compensation for the right to erect and maintain the pipeline, Northville agreed to pay the railroad: "(a) $10,000 in advance, covering a 3-year period during which Northville Dock shall, at its sole cost and expense and at no cost to the Railroad, acquire a right of way from its terminals to the railroad rights of way, procure the necessary consents, licenses, franchises, permits, or other authority, construct the pipe line, etc. After the 3-year period, or when construction is completed if sooner than three (3) years, or if any portion of the pipe line becomes operative within the 3-year period, Northville Dock shall pay the Railroad $1 per inside diameter inch per 100 lineal feet of pipe, plus 1# per barrel of throughput, with a guaranteed minimum of $20,000 per year.” A 20-year term was specified, unless sooner terminated by operation of law or as otherwise permitted, except that the amount of compensation to the railroad was to be subject to renegotiation at the request of either party at the end of 10 years. Northville was also given an option to renew the agreement for an additional 20 years.
Cancellation was permitted by Northville, at any time during the first three years of the original term, and by the railroad, if Northville did not complete at least half the pipeline during said three-year period. This three-year period was subject to extension, but in no event for a period longer than six months, by reason of delays due to such causes as accidents, fires, floods, defaults of subcontractors, or any other similar causes beyond Northville’s reasonable control. Significantly, this cancellation clause provided that "if Northville [Industries] does not so cancel during the first three (3) years of the original term [of the agreement], it will be bound thereafter.”
With respect to the acceleration of payments, it was provided that "the whole compensation for the remainder of the term” would "be due and payable” in the event of any one of the following specified occurrences: (1) if Northville, after the first three years of the original term of the agreement, attempted to remove or manifested an intention to remove all the pipeline and its appurtenances from the railroad’s property; or (2) if Northville became insolvent or bankrupt, or (3) made an assignment for the benefit of creditors, or (4) was sold out by any sale under process of law. In addition, provision was made for arbitration of "any disputed question” with *459 respect to "the construction and performance of this agreement, including the rate of compensation as provided herein”.
Upon execution of the agreement in September of 1965, Northville made the initial $10,000 to the railroad required thereunder and began preparations for the construction of the pipeline. Elaborate plans and specifications were prepared and submitted by Northville to the railroad for approval. In March, 1966, Northville requested permission to use a 12-inch diameter pipeline rather than the 8- or 10-inch diameter originally specified, and the railroad consented to amend the agreement accordingly.
Thereafter, Northville became involved in litigation with third parties concerning the construction of the pipeline and the project was delayed. On July 3, 1968, two months before the expiration of the three-year period in which Northville could cancel, it asked for the additional six months permitted for delays for causes beyond its control. In this connection, Northville stated that through March, 1968, it had expended more than $666,826 in preparing and equipping itself for construction. Around this time, Northville also sought an extension of the time, until October 11, 1969, during which it could cancel, but this extension was never formally consented to by the railroad. Without this extension, the period passed within which Northville was permitted to cancel under the agreement. Nevertheless by a letter dated August 4, 1969, Northville described its dissatisfaction with the railroad concerning the requested extension, and stated that it had concluded that the matter could not be adjusted and that it was forced to cancel the agreement. With the dispute thus unresolved, the pipeline was never built along the railroad’s right of way, although in 1973 Northville commenced use of another pipeline which was constructed along a portion of the Long Island Expressway’s right of way.
The railroad began billing Northville for the guaranteed annual minimum of $20,000, but Northville did not pay these amounts. The railroad then brought an action against North-ville seeking not merely the overdue installments of $20,000, but damages in the amount of $4,446,659, based on estimates of the compensation to which the railroad would have been entitled had the pipeline been constructed and put in operation along its right of way.
At Special Term, the railroad moved for an order pursuant to CPLR 3124 to compel Northville to disclose evidence for the *460 purpose of proving damages concerning the volume of oil which would have been put through the pipeline which was the subject of the agreement. This motion was denied.
On the merits, Special Term considered and rejected the railroad’s argument that under the agreement Northville was obligated to build the pipeline and thus liable for damages based on the volume of oil that would have been put through the line had it been laid and functioning. Instead, it construed the agreement as a license whereby the railroad granted Northville permission to construct and operate a pipeline along the railroad’s right of way, without any obligation on the part of Northville to exercise that privilege. The court also rejected the railroad’s argument that, if such an obligation was not expressed in the contract, it should be implied.
With respect to damages, Special Term dismissed so much of the railroad’s complaint which demanded damages for annual installment payments under the agreement allegedly due after April 11, 1973, the date of the commencement of the action. The court determined that the acceleration clause provided for in the agreement was inapplicable to the cancellation by Northville. Moreover, since it had determined that Northville was not obligated to construct and operate the pipeline, it was concluded that the only compensation to which the railroad was entitled was the guaranteed minimum of $20,000 per year. Viewed in this fashion, the agreement was construed as a contract solely for the payment of money, the court reasoning that the doctrine of anticipatory breach had no application to such contracts, thereby disallowing the railroad’s claim for payments not yet due. Finally, since that portion of the complaint which sought installments due after the date of the commencement of the action had been dismissed, it denied as moot Northville’s motion to dismiss so much of the complaint which demanded damages for payments due after August 31, 1975—for which Northville contended there was no enforceable obligation as to compensation because the agreement afforded either party the right to request renegotiation of the compensation to be paid after that date.
On appeal, the Appellate Division modified. In a memorandum, that court noted its approval of Special Term’s denial of the railroad’s motion for disclosure, and stated that under the agreement the railroad could not recover damages of more than the guaranteed minimum of $20,000 per year. In modify *461 ing, however, the court declared that it believed the doctrine of anticipatory breach to be applicable in this action and further stated that, since the agreement "sufficiently provided” for the payment of compensation during the last 10 years, the railroad is not limited to damages which allegedly accrued prior to the commencement of the action.
The order of the Appellate Division should be affirmed.
Summary judgment was properly granted in the courts below with respect to the interpretation of the instrument under scrutiny. The intention of the parties is fully determinable from the language employed in the agreement (see 4 Williston, Contracts, § 600, at p 280), and there is no need to resort to evidence outside the written words to determine the intention of the parties. Accordingly, as no question of fact was presented but only one of law—the interpretation of the written agreement—summary judgment was proper (see Mallad Constr. Corp. v County Fed. Sav. & Loan Assn., 32 NY2d 285, 291).
Proper, too, was the determination that the express terms of agreement did not obligate Northville to construct and operate a pipeline along the railroad’s right of way. The agreement was purely and simply a license arrangement (cf. Lordi v County of Nassau, 20 AD2d 658, 659, affd 14 NY2d 699). To construe various portions of the agreement in such a fashion as to place an obligation on Northville to exercise the privilege granted to it, as urged by the railroad, would be contrary to the obvious intention of the parties as expressed therein.
Equally unpersuasive is the railroad’s argument that even in the absence of an express contractual requirement, North-ville would be impliedly obligated to construct, operate and maintain a pipeline. Of course, a promise may be implied from a fair interpretation of an agreement (see, generally, 5 Williston, Contracts, § 670). Courts have frequently held that a promise, though not expressed, is implied (see, e.g., Ehrenworth v Stuhmer & Co., 229 NY 210, 219). But such an obligation should not be implied in this agreement. Contrary to the assertions of the railroad, this contract is not " 'instinct with an obligation’ ” on the part of Northville to construct and operate the pipeline (cf. Wood v Duff-Gordon, 222 NY 88, 91).
The railroad’s reliance on Genet v President of Delaware & Hudson Canal Co. (136 NY 593) is similarly misplaced. As noted by Special Term below, that case is distinguishable in that there the failure ,to continue operations on the plaintiffs *462 land rendered the land unproductive, whereas here the cancellation by Northville, though harmful to its expectations, is ancillary to the railroad’s business. More importantly, however, in Genet, the court stressed that in implying a promise a court should act prudently and that "a promise can be implied only where we may rightfully assume that it would have been made if attention had been drawn to it” (p 609, citing Dermott v The State, 99 NY 101). That part of the opinion, emphasizing prudent application, has served as the guiding principle in cases thereafter (see, e.g., Wilson v Mechanical Orguinette Co., 170 NY 542, 550-551). So mindful, it may not be rightfully assumed that the parties here intended to require Northville to construct the pipeline. To the contrary, the agreement manifests that had such an obligation been intended, it would have been expressed. The other cases relied on by the railroad are also distinguishable. Accordingly, since no obligation may be implied on the part of Northville to construct and operate the pipeline, the railroad may not recover damages based on estimates of the compensation to which it would have been entitled had Northville exercised its privilege to operate a pipeline.
Since Northville was not obligated to construct and operate the pipeline, the railroad’s damages are limited to the $20,000 per year minimum guarantee set forth in the agreement. In this respect, however, Northville argues that since the agreement provided that either party might request renegotiation at the end of the first 10 years of the 20-year term, the parties did not reach an understanding on the compensation to be paid during the last 10 years of the agreement, and hence no recovery can be had by the railroad for that period. This argument should not be sustained.
This provision did not constitute an agreement to agree. It did not contemplate a situation whereby the price was to be fixed by mutual assent and, if the parties did not agree, the contract would terminate (see St. Regis Paper Co. v Hubbs & Hastings Paper Co., 235 NY 30). Neither is this a situation where the agreement called for compensation in a sum not exceeding a certain dollar amount (see United Press v New York Press Co., 164 NY 406). Hence, these cases, relied on by Northville, are not determinative of the enforceability of this agreement.
The agreement provided a formula for determining compensation based on pipeline dimensions and oil throughput, with *463 a guaranteed minimum of $20,000 per year. True, the amount of compensation was subject to renegotiation at the request of either party at the end of 10 years. This does not mean, however, that after 10 years either party could be relieved of any further obligation simply by refusing to agree on the amount of compensation for the second 10 years. The agreement would not terminate at this point because, contrary to the assertions of Northville, the parties agreed to arbitrate disputes involving compensation for that period. As to North-ville’s argument, it is sufficient to note that the agreement provides for arbitration of "the rate of compensation”, and to conclude that the renegotiation was not arbitrable, merely because the clause relating to renegotiation speaks in terms of the "amount” rather than the "rate” of compensation, would be an unnecessarily technical interpretation, and obviously contrary to the intention of the parties.
The short of it is that the requirement of arbitration precludes termination because of any disagreement over compensation for the second 10 years. Of course, the court cannot know what the arbitrators would have determined had North-ville built the pipeline and thereafter sought renegotiation of the amount of compensation. Nevertheless, the failure of Northville to cancel within the permissible period therefor bound Northville to pay the guaranteed minimum for 20 years, and, in view of the arbitration clause, the potential for renegotiation does not support Northville’s argument as to the agreement’s unenforceability for the second 10 years.
The only remaining issue is whether the railroad is presently entitled to future installments of the guaranteed minimum under the doctrine of anticipatory breach. Under this doctrine, if one party to a contract repudiates his duties thereunder prior to the time designated for performance and before he has received all of the consideration due him thereunder, such repudiation entitles the nonrepudiating party to claim damages for total breach (see, generally, 11 Williston, Contracts, § 1301; 4 Corbin, Contracts, § 959).
The doctrine of anticipatory breach has not generally been applied to all types of contracts, its application being limited ordinarily to bilateral contracts embodying some mutual and interdependent conditions and obligations. Moreover, limitations on the doctrine exist even in the instance of "a contract originally bilateral that has become unilateral and similarly unconditional by full performance by one party” (Restate *464 ment, Contracts, § 318; cf. Restatement 2d, Contracts, § 277, subd [1], Tent Draft No. 8). For the doctrine to apply there must be "some dependency of performances” (Restatement, Contracts, § 318, Comment e). For this reason, a party who has fully performed cannot invoke the doctrine even though the other party has repudiated (see Restatement 2d, Contracts, § 277, Comment c, Tent Draft No. 8).
Since the doctrine has evolved as a defense to performance by the injured party, the theoretical basis for not applying it to unilateral contracts or bilateral contracts that have been fully performed by the injured party is that its application is unnecessary to such contracts (see 11 Williston, Contracts, § 1305, p 92; see, also, § 1313, pp 111-112). To this is added the reasoning of Professor Williston, who wrote that since "the whole doctrine was founded on a confusion of a right of action with a defense, it seems undesirable to enlarge the boundaries of the doctrine” to encompass unilateral contracts (§ 1326, p 150). Of a different view is Professor Corbin who criticized the limitations on the doctrine, particularly with regard to the situation where the contract is unilateral simply because the injured party has already performed. In this respect, he characterized as "erroneous [the] idea that the reason for holding an anticipatory repudiation to be a breach of contract is that otherwise the injured party must continue to be ready to perform on his own part” (4 Corbin, Contracts, § 962, pp 864-865). Rather, he suggested that the reasons upon which the doctrine "can actually be sustained are equally applicable to unilateral contracts” (p 865; see, also, Calamari & Perillo, Contracts, § 184, at pp 291-292).
Generally, the courts in most jurisdictions have followed Williston’s views rather than those of Corbin, and have thus limited the doctrine of anticipatory breach to bilateral contracts. An extreme exception is Texas, the courts of which have stated that the doctrine should be applied "without distinction to contracts still to be performed on both sides and those fully executed” and also that "no distinction should be made between contracts to pay money, pure and simple, and other such contracts” (Pollack v Pollack, 46 SW2d 292, 295 [Tex]; accord Pitts v Wetzel, 498 SW2d 27 [Tex]). In our jurisdiction, it was commented sometime ago that the doctrine "is not generally applied to contracts for the payment of money at a future time” and that in this State it seems to be limited to contracts to marry, for personal services and for the *465 manufacture or sale of goods (Kelly v Security Mut. Life Ins. Co., 186 NY 16, 19 [1906]). But this observation did not reflect the full range of thought even then because, before that time, it was recognized that where there are interdependent obligations the doctrine might be applied to money payable under a contract at a future time (see Nichols v Scranton Steel Co., 137 NY 471, 486-488, esp p 487 [1893]; cf. Bernstein v Meech, 130 NY 354, 358 [1891]).
A further limitation on the application of the doctrine of anticipatory breach occurs with respect to independent, as contrasted with interdependent, obligations in bilateral contracts. Such independent promises in bilateral contracts may be treated as separate unilateral obligations, thus preventing the application of the rule to such contracts (see 11 Williston, Contracts, § 1327, p 157; 4 Corbin, Contracts, § 986). A lease is an example of a bilateral contract where obligations are sometimes treated as independent. Perhaps for this reason, the courts of this State have held that "no suit can be brought for future rent in the absence of a clause permitting acceleration” (Maflo Holding Corp. v S. J. Blume, Inc., 308 NY 570, 575, relying on McCready v Lindenborn, 172 NY 400, 408; see, also, International Pub. v Matchabelli, 260 NY 451, 453-454; cf. Hermitage Co. v Levine, 248 NY 333, 337). Some jurisdictions, however, treat a lease as a contract involving interdependent obligations and thus apply the doctrine of anticipatory repudiation to breaches of the covenant to pay rent (see, e.g., South Main Akron v Lynn Realty, 62 Oh L Abs 103, 106 NE2d 325, 329; Hawkinson v Johnston, 122 F2d 724, 730).
Northville contends that the railroad’s "passive role is identical with that of a landlord under a lease.” This characterization neglects both the facts of this case and the law as it has developed. First, this agreement expressly provided that this was to be a license and not a lease, a proposition that would be apparent from the four corners of the agreement even without this express statement. Second, in this area of the law one may not accurately compare a license with a lease, particularly when one considers the fact that a lease was regarded primarily as a conveyance at common law and that the rules with respect to leases and other real estate transactions became settled before the law of mutually dependent promises had developed (see 6 Williston, Contracts, § 890, esp pp 587-588; see, also, 4 Corbin, Contracts, § 986, pp 954-955). Lastly, are the policy considerations regarding leases, *466 which are contracts of far more common occurrence than a license such as the one involved in this case. For these reasons, it cannot be said that the agreement here is governed by the principles applied to leases—a license such as this, though superficially similar, is of a different genre.
In the instant matter, as noted, the railroad is not entitled to damages based on the estimates of pipeline use, and all that remains for the railroad to recover is the guaranteed minimum of $20,000 per year, for the full 20-year term of the agreement. Special Term construed this as a contract solely for the payment of money and reasoned that the doctrine of anticipatory breach has no application to such contracts. For this reason, that court limited the railroad’s recovery to installments due as of the commencement of the action. The recovery should not be so restricted.
The statement is often made that the doctrine of anticipatory breach has no application to contracts for the payment of money only, in installments or otherwise (see, e.g., Kelly v Security Mut. Life Ins. Co., 186 NY 16, supra; McCready v Lindenborn, 172 NY 400, supra; Sholom & Zuckerbrot Queens Leasing Corp. v Forate Realty Corp., 29 AD2d 571; Sinkwich v Drew & Co., 9 AD2d 42, 46; Indian Riv. Islands Corp. v Manufacturers Trust Co., 253 App Div 549, 551). But these words, "contracts for the payment of money only”, by themselves state no principle and are merely descriptive of the means of satisfaction of an obligation. The words employed should not obliterate the principles needed to determine whether the doctrine of anticipatory breach applies. As once remarked: "The root of any valid distinction is not in the difference between money and merchandise or between money and services. What counts decisively is the relation between the maintenance of the contract and the frustration of the ends it was expected to subserve. The ascertainment of this relation calls for something more than the mechanical application of a uniform formula” (New York Life Ins. Co. v Viglas, 297 US 672, 680-681).
The question is whether, at the time of the repudiation, there existed some dependency of obligation (see Restatement, Contracts, § 318, Comment e). If the obligations are interdependent, a claim may lie to recover money payable in the future (see Nichols v Scranton Steel Co., 137 NY 471, 487-488, supra). Whether such an obligation exists on the part of the *467 injured party is, of course, a matter of interpretation of the particular contract, and one that may be subject to differing views (see Federal Life Ins. Co. v Rascoe, 12 F2d 693 [1926], a case twice disapproved by the Supreme Court [see New York Life Ins. Co. v Viglas, supra, at p 679; Mobley v New York Life Ins. Co., 295 US 632, 639], not on the question of whether the contract there involved dependent obligations, but on the ground that in the court’s view the insurers did not, under the circumstances therein, repudiate the policies [see 4 Corbin, Contracts, § 967, at pp 877-879, esp p 879]).
At least in a case such as this, the fact that only money is owed by Northville to the railroad is not determinative. The focus must be on whether the railroad has any obligation from which it needs to be relieved (cf. Central Trust Co. v Chicago Auditorium, 240 US 581, 590-591). Analysis of this agreement leads to the inescapable conclusion that the railroad is obligated to future performance. In order to recover in a future action, the railroad must show that it is still in a condition to perform. It matters not that all that is involved is a use upon the railroad’s property. For example, at a later date the railroad may decide it necessary to abandon that portion of its property containing the right of way, or it may need to sell or lease to one whose use of the property would prevent the construction of the pipeline. In a future suit the argument certainly would be advanced that the railroad is not entitled to recover any future installment because, under these circumstances, it too is in breach of the agreement. This manifests "dependency of performances” and thus the need to apply the doctrine of anticipatory breach.
That the acceleration clause in the agreement did not contemplate the circumstances of the cancellation by North-ville is not a reason to deny recovery to the railroad for the anticipatory breach by Northville. This does not mean the parties intended to foreclose the application of the doctrine. Lawyers drafting an agreement presumably know that an acceleration clause providing for the recovery of future rents is necessary in a lease (see Maflo Holding Corp. v S. J. Blume, Inc., 308 NY 570, supra), and that in a series of notes under one loan, an acceleration clause is necessary in order to recover on notes payable in the future. Of course, a broader clause would have made this case easier of resolution. But the failure to draft a clause contemplating a breach after the time for permissible cancellation by Northville had expired does *468 not preclude the operation of the doctrine of anticipatory breach.
Application of the doctrine of anticipatory breach to this case does no violence to earlier precedents. This was not a simple arrangement for payment of a fixed sum such as an annuity. Neither was it an installment arrangement such as might be used to purchase a business (cf. Indian Riv. Islands Corp. v Manufacturers Trust Co., 253 App Div 549, supra). There is no need for concern here regarding acceleration of the date of maturity as is the concern under those type of arrangements (cf. 4 Corbin, Contracts, § 965). This agreement was a license embodying mutual and interdependent obligations between the railroad and Northville. That the obligations of the railroad were less than those of Northville or, to some, may seem to be of a circumscribed nature, is not a basis for a restrictive, formalistic approach to the question of whether the doctrine of anticipatory breach applies. In this case, therefore, it is not necessary to enlarge the doctrine as far as have some jurisdictions (see, e.g., Pollack v Pollack, 46 SW2d 292 [Tex], supra) or to consider generally whether the doctrine of anticipatory breach should be applicable to unilateral contracts (see 4 Corbin, Contracts, §§ 962-964). The doctrine is flexible enough to permit its application to the railroad’s claim in this case for that portion of the guaranteed minimum not yet due. This does not mean, however, that the railroad is presently entitled to the full $20,000 guaranteed minimum for those annual payments not yet due. Since these amounts will be collected in advance of their due date, the respective installments should be discounted to their present value (see Nichols v Scranton Steel Co., 137 NY 471, 487, supra; 4 Corbin, Contracts, § 964, pp 870-871).
Accordingly, the order of the Appellate Division should be affirmed, without costs, and the question certified answered in the affirmative.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones and Fuchsberg concur; Judge Wachtler taking no part.
Order affirmed, etc.